EXHIBIT "A"


**KeyBank**

## KEY EQUITY OPTIONS AGREEMENT

**Meaning of Words:** In this Agreement the words "we" "us" and "our" mean KeyBank National Association ("KeyBank") _4910 Tiedeman Road, Suite C, Brooklyn, Ohio 44144_ The words "you" and "your" mean jointly and severally
_LARRY B. WEINSTEIN_ _____     _LINDA WEINSTEIN_ _____
_____     _____
_7 STILLO DR     AIRMONT, NY 10952_ _____
(Borrower(s) Name(s) and Residence) and the word "Agreement" means this Key Equity Options Agreement.

**Terms of Agreement:** This Agreement governs the use of your Key Equity Options line of credit account (the "Account") with us. It describes your variable rate, open-end, revolving line of credit with us (the "Variable Rate Portion") and the Fixed Rate Option by which you may elect to repay certain advances against your line ("Line") of credit at a fixed interest rate for a specified term.

### I. KEY EQUITY OPTIONS AGREEMENT

**1. Credit Limit:** An approved Line of $ _250,000.00_ ("Credit Limit") is established for your Key Equity Options Account. During the draw period, you may obtain advances ("Advance"), repay and then obtain additional Advances, provided such Advances would not cause your Credit Limit to be exceeded. Your Credit Limit will be reduced by Advances taken against your Account and by the amount of any Fixed Rate Option(s) which you elect to take. During the draw period, any amount(s) you repay against the outstanding principal balance of the Variable Rate Portion or any Fixed Rate Option will increase the amount of credit available to you accordingly. During the repayment period, you will no longer be entitled to obtain Advances. You agree not to request an Advance which would cause the total of Advances outstanding, together with all other sums owed under this Agreement (including finance charges and other charges), to exceed the Credit Limit. You further agree not to use any such Advances for any purpose expressly prohibited in any Rider to this Agreement which is incorporated into this Agreement.

**2. Access to Your Account:** You may obtain and direct Advances from your Account, up to your Credit Limit, as follows
    **A. Cash Advance**. You may request a Cash Advance in person at designated branches during normal business hours,
    **B. Telephone Transfer.** You may request an Advance from us if you have a deposit account with us and have been approved for telephone transfers, by making a telephone transfer request for a specified sum to be advanced under your Account and deposited in a deposit account that is maintained with us. In order to access your Account by telephone transfer you must maintain one or more eligible deposit accounts with us throughout the term of this Agreement, including the term of any Fixed Rate Option. No separate minimum balance or usage requirements for those deposit accounts are imposed under this Agreement,
    **C. Overdrafts-Linked Account.** If you have a demand deposit account with us that is linked to your Account, you may access your Account by an overdraft of that linked deposit account (the "Linked Account") up to the amount of your Credit Limit. Only one deposit account may be linked to your Account for the overdraft protection
    The linking of a deposit account to your Account is optional, but you will not enjoy any overdraft privileges unless you do link a deposit account to your Account. If the Linked Account becomes overdrawn, funds will automatically be transferred to the Linked Account in an amount sufficient to cover the overdraft. Overdrafts of the Linked Account will be covered up to the amount of your available Credit Limit whether the overdraft occurs through charges or other debits to the Linked Account or your accessing the Linked Account. The person(s) who signed the Agreement as Borrower(s) must also be the same and only person(s) who are identified as owners of the Linked Account,
☐ If this box is checked, you elect to use your Key Equity Options Account as overdraft protection on your KeyBank
    Checking Account Number _____, and
    **D. KeyEquity Card. (THE KEYEQUITY CARD IS NOT AVAILABLE IN NEW YORK)** You will be issued and agree to accept a KeyEquity Card credit card. All transactions you make with the Key Equity Card will be treated as an Advance and posted to your Account as of the date of the transaction, and
    **E. Equity Line Checks.** Your Account may be accessed by special Equity Line Checks ("Checks") provided by us. You will receive these Checks imprinted with your Account number. The amount of each Check will be treated as an Advance and posted to your Account.

**3. Promise to Pay:** You promise to pay all amounts outstanding on your Account, including any fees and charges we impose. If more than one person signs this Agreement, you agree that (i) we can enforce our rights against each of you individually or against all of you together and (ii) we can send Account statements, notices and any other correspondence to either of you.

**4. Security:** You are giving us the right of setoff and a mortgage/deed of trust security interest on your Residence or the real estate located at _7 STILLO DR     AIRMONT, NY 109524149_ _____ ("Property") (Address if different than above) You agree to execute a mortgage deed or deed of trust ("Security Instrument") giving us a security interest in this real estate. All Advances up to the Credit Limit, which we are obligated to make under this Agreement, will be secured by the Security Instrument. Except for the liens described in the Security Instrument, you will not permit, create or allow any other encumbrance or lien on this real estate without our prior written consent. We will consider any default by you under the Security Instrument a default in the material obligations under this Agreement. You could lose your Property if you don't meet the obligations in your Agreement with us. Other property held by us as collateral securing other loans (unless the other property is the principal residence of any person having an ownership interest in that property) may also secure your Account

Page 1

Line #
ACAPS #

## KEY EQUITY OPTIONS AGREEMENT

**5. Key Protect:** You are not required to obtain accidental loss of life, natural loss of life or accidental disability debt cancellation protection (collectively referred to as "debt cancellation protection") as a condition of obtaining credit under this Agreement. If we have offered you debt cancellation protection and you have elected to purchase it from us, you authorize us to add the cost of the debt cancellation protection fee to your Account each monthly billing cycle. If you want this optional protection, you must complete a separate application. We may allow you to exceed the Credit Limit temporarily from time to time to accommodate these debt cancellation fee amounts and you may be charged an Over Limit fee. The amount of debt cancellation protection available for purchase may not be sufficient to cover the entire outstanding balance of your Account.

**6. Term/Minimum Monthly Payment:** *Draw Period.* The length of the Draw Period during which you can obtain Advances against your Account is Twenty (20) _____ years ( 240 __ months ). During the Draw Period, payments are due monthly. You agree that during the Draw Period you will make payments equal to the required minimum payment for both the Variable Rate Portion and any Fixed Rate Option(s) ("Minimum Monthly Payment"). In addition to the required minimum payment for both the Variable Rate Portion and any Fixed Rate Option(s), your Minimum Monthly Payment will also include any past due amounts, and any fees, charges or debt cancellation fees. The Minimum Monthly Payment may not fully repay the principal outstanding on your Account.

You are required to pay us immediately all amounts exceeding your Credit Limit. The amount of your payment may change because the Annual Percentage Rate ("APR") is variable on the Variable Rate Portion. You promise to pay us the unpaid balance of Advances plus the Finance Charges, calculated at the daily periodic rate, and any additional charges permitted by this Agreement. Rate information will be provided on the monthly statements that we send you.

**A. Variable Rate Portion:** Required Minimum Payment (Select one of the following payment options.)

| | | |
|---|---|---|
| ☐ | Interest Only | An amount equal to accrued Finance Charges. |
| ☒ | Regular Payment | An amount equal to the greater of (a) 1/240th of the unpaid balance of Advances plus accrued Finance Charges or (b) $100.00, and all previously billed but unpaid minimum payments to your Account. Balances of less than $100.00 must be paid in full. |

**B. Fixed Rate Option:** You agree to repay any Fixed Rate Option ("Option") in consecutive, substantially equal monthly payments at the interest rate, for the term, and with such other conditions as agreed upon at the time you exercise the Option. The monthly payment due on any Option will be an amount of principal and interest sufficient to amortize the Option over the term selected by you at the time the Option is exercised. This payment will be in addition to and combined with the required minimum payment due for your Variable Rate Portion as described in the Agreement. Disclosure of the required minimum payment due on the Option will be based on an estimated disbursement date.

If at the time that the Variable Rate Portion of your Account matures you still owe money under the terms of any Option(s), you shall continue to make payments on such Option(s) according to the terms and conditions of the Option confirmation notice(s) (which are incorporated into this Agreement by reference) and according to this Agreement.

**7. Term/Minimum Monthly Payment:** *Repayment Period.* The Repayment Period begins the first day after the Draw Period ends and continues for Fifteen (15) _____ years ( 180 __ months ). After the Draw Period ends, you will not be able to obtain any more Advances or exercise any Options and you will begin to repay the outstanding balance on your Variable Rate Portion by making consecutive monthly payments. During the Repayment Period, payments will be due monthly. Your monthly payment for the Variable Rate Portion will be computed, at the beginning of the Repayment Period and each year thereafter, to yield the monthly payment amount necessary to fully amortize the outstanding balance, together with Finance Charges, over the remaining term at the then current APR. There will be a minimum payment of $100 for the Variable Rate Portion during the Repayment Period and if your principal balance is less than $100, the full amount will be due. If the accrued Finance Charges for any given billing period on the Variable Rate Portion exceed the monthly payment for that same billing period, your monthly payment will be equal to the accrued Finance Charges for that billing period. The Minimum Monthly Payment due on your Account during the Repayment Period will include any monthly payment due on your Variable Rate Portion, any monthly payments due on your Option(s), any past due amounts, any fees charged to your Account, and any debt cancellation fees.

**8. Variable Rate Portion. Prime Rate Index:** You must pay a Finance Charge on all Advances from the date each Advance is made until we receive payment in full. The Finance Charge is figured separately for both the Variable Rate Portion and any Fixed Rate Option(s). The Index used by us to determine the Finance Charge for the Variable Rate Portion is the "Prime Rate" as published in the Wall Street Journal "Money Rates" table ("Index"). The Index is published in each edition of the Wall Street Journal. Where more than one Prime Rate is published in any edition, the Index will be the highest of the Prime Rates set forth. The Prime Rate is just a pricing index and is not necessarily the lowest rate charged by us or any other lender. If the Index becomes unavailable for whatever reason, we will choose another Index which is also readily available and verifiable by you and which is beyond our control. We will notify you of the substitute or replacement Index. We may also change the margin if the Index becomes unavailable. The selection of any replacement Index and margin will be done in compliance with applicable law.

**9. Fixed Rate Option. Fannie Mae Index:** You must pay a Finance Charge on the Option from the date you exercise the Option until we receive payment in full. The index used by us to determine the Finance Charge for the Option(s) is equal to Fannie Mae's required net yield, as of the business day prior to the date that you exercise the Option, for-30-year fixed rate mortgages covered by applicable 30-day mandatory delivery commitments as published in the Wall Street Journal "Money Rates" table ("FRO Index"). The FRO Index is published in each edition of the Wall Street Journal. If the FRO Index becomes unavailable for whatever reason prior to the date you exercise an Option, we will chose another FRO Index which is also readily available and verifiable by you and which is beyond our control. We will notify you of the substitute or

Page 2

Line #
ACAPS #

**KEY EQUITY OPTIONS AGREEMENT**

replacement FRO Index  We may also change the margin(s) disclosed below if the FRO Index becomes unavailable.  The selection of any replacement FRO Index and Margin(s) will be done in compliance with applicable law.

**10   Maximum Annual Percentage Rate:**  Your maximum APR is 18 0%, which is a Daily Periodic Rate of 049315% (.049180% in a leap year).  Your APR may change by any amount on any Change Date not to exceed the maximum APR.

**11.  Variable Annual Percentage Rate:**  *Variable Rate Portion*  Your Account has a variable rate feature  The APR and the minimum payment can change as a result.  The APR is based on the value of the index ("Index") described above.  To determine the APR that applies to your Account we ☐ add ☒ subtract a Margin of _0. 76_____ % to the value of the Index  The APR does not include costs other than interest.  The APR on your Account may change daily  If the Index increases in value (assuming the same outstanding balance), the APR and minimum payment will also increase  If the Index decreases in value (assuming the same outstanding balance) the APR and minimum payment may decrease, but the minimum payment during the Draw Period will always be at least the accrued Finance Charges, if you chose the interest only payment option, or the lesser of $100 or the outstanding balance, if you chose the principal plus interest payment option  During the Repayment Period, the minimum payment will always be at least the lesser of $100 or the outstanding balance  If the Daily Periodic Rate increases, a lesser portion of your minimum payment may be applied to principal and a greater portion will be applied to Finance Charge  The APR does not take into account your optional Linked Account.

The date on which your APR could change is called "Change Date".

**12.  Finance Charge:**  *Variable Rate Portion*  We figure the daily Finance Charge on your Account by multiplying the Daily Balance by the Daily Periodic Rate then in effect.  Then we add all of the daily Finance Charges together to get the total accrued Finance Charge for the billing cycle  The Daily Balance is figured this way: we take the beginning principal balance (which excludes unpaid Finance Charges [except for financed closing costs, if any]), each day and add to it any new debit amounts (each of which is posted as of the effective date of the transaction)  The principal balance includes the amount of the Advance and any other items that are financed, such as closing costs, if any  Next we subtract payments and credits posted to the Account's principal balance (each of which is posted as of the effective date of the transaction)  This gives us your Daily Balance  (For purposes of figuring the Daily Balance, we will not subtract any payment or portion thereof, that is in excess of the principal balance  For each day there is a balance in excess of the principal balance ("credit balance"), we will use zero in place of the credit balance.)  We determine a daily periodic rate by dividing the "Annual Percentage Rate" by the number of days in a year (365 or 366).  Your periodic rates may vary.

The Finance Charge does not include costs other than interest  The Finance Charge does not take into account your optional Linked Account.  Payment in full of the new balance by the due date will not avoid the assessment of Finance Charges on the balances from the date shown on your monthly statement through the date paid  Finance Charges begin to accrue as of the effective date of the Advance or charge  There is no grace period

**13.  Initial Disclosure:**  *Variable Rate Portion.*

☒     If this box is checked, the **APR** as of _11/25/07____  is _6.74___ %, which is a **Daily Periodic Rate** of _0. 01846575_____ %.  This rate may change daily

The initial APR is based on the Index and margin used for later rate adjustments.

    **A.  Promotional Rate Discount**

☐     If this box is checked, the initial **APR** is _n/a____ %, which results in a Daily Periodic Rate of _n/a_____ %.  The initial **APR** is "discounted."  This initial **APR** is based on the Index ☐ plus ☐ minus a margin of _n/a_ %     The initial index plus/minus a margin will remain in effect through _n/a_____  After the discounted period, the **APR** that will apply is the Index then in effect ☐ plus ☐ minus a margin of _n/a_____ % which, as of _n/a_____ , is _n/a_____ % **APR** and a Daily Periodic Rate of _n/a_____ %

The initial APR is not based on the margin used for later rate adjustments

☒     If this box is checked, you must agree to take a **minimum initial advance of** _$50,000___  at the time the Account is opened in order to obtain the promotional rate discount.  We reserve the right to apply the initial, non-discounted  rate to the Account if the **required minimum initial advance is not taken**

☒     If this box is checked, you must **have, or agree to open, a deposit account with us** in order to obtain the promotional rate discount  We reserve the right to apply the initial, non-discounted rate to the Account if you do not have the required deposit account.

**14.  Nature of a Fixed Rate Option:**  During the Draw Period, you may use the Fixed Rate Option to convert amounts you owe under the Variable Rate Portion of your Account from a variable to a fixed rate of interest.  An Option will have a fixed interest rate and specified term, and allows you to repay a specified amount in substantially equal consecutive monthly payments that will be in addition to and combined with any minimum payment on your Variable Rate Portion.  An Option may be for any amount between $5,000 and the amount of the credit remaining on the Variable Rate Portion of your Account  If there is an Option outstanding, your Account will consist of a Variable Rate Portion (reflecting the Advance(s) against the Line) and an Option portion (reflecting the Advances(s) against the Line which you have elected to repay at a fixed rate over a specified term)  Your monthly statement will reflect both portions of your Account.  You may choose a term between 12 and 180 months.  The term of the Option may extend beyond the maturity of the Variable Rate Portion of your Account.

UN_KBNA KEOP/KEOH Agreement
Rev 02/2007

Line #
ACAPS #  ████████

## KEY EQUITY OPTIONS AGREEMENT

**15. Conditions for Exercising a Fixed Rate Option:** You may exercise an Option if a) you are in the Draw Period; b) no default exists under the terms of the Agreement, c) there are not more than three Fixed Rate Options outstanding after you exercise the Option, d) you have not exercised more than two Options within the previous 365 day period; and e) you sign any request forms that may be required by us to confirm your decision to exercise the Option. In no case may you exceed your Credit Limit by exercising the Option.

**16. Exercising the Fixed Rate Option:** To exercise the Fixed Rate Option call 1-800-KEY2YOU at such times or locations as we tell you

**17. Finance Charge:** *Fixed Rate Option.* The Finance Charge on the Fixed Rate Option Portion of your Account is made up of the sum of two components as follows A. The first component is calculated by multiplying the Daily Balance for each day by the Daily Periodic Rate then in effect (The Daily Periodic rate is determined by taking the FRO Index in effect, adding the appropriate Margin as described below, and dividing by the number of days in the year [365 or 366]) Then we add all of the daily Finance Charges together to get the total accrued Finance Charge for the statement cycle B. The second component is the Fixed Rate Option Fee, whether financed or separately paid. (Finance Charge = A+B) The Daily Balance is figured this way. we take the beginning principal balance (which excludes unpaid Finance Charges [except for any financed Fixed Rate Option fee] and certain other charges, if any The principal balance includes the amount of the Option and any other items that are financed, such as the Fixed Rate Option fee, if any Next we subtract any payments and credits posted to the Account's principal balance (each of which is posted as of the effective date of the transaction) This gives us your Daily Balance

**18. Initial Disclosure:** *Fixed Rate Option.* To the FRO Index value we will add a Margin of **.500** % for Options between 12 and 60 months, **.750** % for Options of more than 60 months to 120 months, and **1.500** % for Options of more than 120 and 180 months As of **11/26/07**, the **Daily Periodic Rate** for an Option of 12 to 60 months is **0.01816438** % This is an APR of **6.630** % As of **11/26/07**, the **Daily Periodic Rate** for an Option of more than 60 to 120 months is **0.01884932** %. This is an APR of **6.880** % As of **11/26/07**, the **Daily Periodic Rate** for an Option of more than 120 to 180 months is **0.02090411** % This is an APR of **7.630** % Once an Option has been established, the Daily Periodic Rate for that Option *will not change* However, if the Daily Periodic Rate quoted to you for an Option changes before you exercise the Option, the corresponding minimum payment and APR may be different than the one quoted to you. An increase in the Daily Periodic Rate may increase the minimum payment Notwithstanding any other provision in this Agreement, we do not intend the interest we charge to exceed the maximum rate allowed under applicable law The APR (shown here) does not include costs other than interest Finance Charges begin to accrue as of the effective date your Advance is converted to an Option

    **A. Promotional Rates** We may, in our discretion, offer a promotional rate from time to time to apply to any Option that meets the criteria for the promotional offer and is exercised during the promotional period. If we, in our discretion, choose to offer a promotional rate, the rate will be based on the FRO Index and will be equal to either the FRO Index, the FRO Index plus a reduced Margin, or the FRO Index minus a Margin. Any promotional rate offered will be set by us but will never exceed the rate determined by adding the Margin, stated above, to the FRO Index We will tell you the FRO Index and Margin, if any, that will apply to your Option at the time you exercise the Option.

**19. Fixed Rate Option Fee. Finance Charge:** You will pay a Fixed Rate Option fee of $ **50.00** when you elect to exercise an Option The APR shown on your monthly statement may increase for the month in which the fee is imposed It may exceed the maximum APR shown above because it includes costs other than interest. This is the second component of the Finance Charge

**20. Annual Membership Fee:** Your Key Equity Options Account may be charged an annual membership fee of $ **0.00** during the Draw Period whether or not you use the Account If a membership fee is charged, the membership fee will be charged to your Account upon signing the Agreement and will automatically be charged to your Account annually in the month of the anniversary date of the opening of your Account The membership fee is non-refundable and you will owe it once it is charged to your Account whether or not your Account is subsequently changed, suspended or terminated for any reason

☐ If this box is checked, the Annual Membership Fee is waived for the first year

**21. Other Fees:** In addition to the Annual Fee, Fixed Rate Option Fee, and Closing Costs described in this Agreement, we charge the following fees
    (a) **Late Fee** We charge a late fee if we do not receive at least the Minimum Monthly Payment within ten (10) days after the payment due date, as stated on your monthly statement. The late fee for each late Payment will be ten percent (10%) of the Minimum Monthly Payment amount, not to exceed $30 00
    (b) **Returned Item Fee** We may charge a returned item fee if any check or other instrument given for payment on the Account is dishonored for any reason The returned item fee may be $20 00.
    (c) **Overline Fee.** In the event you incur charges in amounts exceeding your Credit Limit, an overline fee in the amount of $20 00 may be charged for each instance where your Credit Limit is exceeded
    (d) **Check Stop Payment Fee.** A fee of $20.00 may be charged in connection with each Check stop payment order placed by you A Check Stop Payment Fee is not charged if your Account was opened in Indiana or Maine
    (e) **KeyEquity Card Replacement Charge.** A fee of $10 00 may be charged to replace a KeyEquity Card for any reason
    (f) **Discharge Fee.** When we discharge or otherwise release the Security Instrument, you will be charged a fee for recording the discharge or satisfaction subject to any limitations applicable law imposes Based upon current costs, we estimate the fee to be $ **33.50** .
    You also agree to pay, if applicable law permits and subject to any limitations applicable law imposes, all costs we incur in collecting amounts owed under this Agreement or in enforcing or defending our rights under this Agreement.

UN_KBNA KEOP/KEOH Agreement
Rev 02/2007

Line #
ACAPS #

## KEY EQUITY OPTIONS AGREEMENT

These costs may include collection agency fees, attorneys' fees, (which may exceed two percent (2%) of the total principal, interest and costs due), filing fees and court costs

The above fees will be added to the Minimum Monthly Payment due.

**22. Additional Charges:** You agree to pay the following charges

| | | | | |
|---|---|---|---|---|
| (a) Filing Fees | $ 0.00 | | (f) Flood Hazard Determination | $ 0.00 |
| (b) Title Search/Title Insurance | $ 0.00 | | (g) Life of Loan Flood Tracking | $ 0.00 |
| (c) Property Appraisal | $ 0.00 | | (h) Mortgage Tax | $ 0.00 |
| (d) Credit Report | $ 0.00 | | (i) | $ 0.00 |
| (e) Notary | $ | | TOTAL | $ 0.00 |

**23. Account Termination Fee:** If you voluntarily terminate this Agreement at any time prior to three (3) years from the date hereof, we charge and you agree to pay us a termination fee of $ 450.00

**24. Insurance:** In connection with the Security Instrument, we require fire and extended Property insurance in an amount equal to all liens on the Property described in the Security Instrument with a mortgagee payable clause in our favor. In addition, we require flood insurance, if applicable, as described in the Security Instrument. Your failure to meet this requirement will constitute an inaction by you that adversely affects our security thereby creating an event of default. This Property insurance will not be provided nor financed by us but may be obtained by you through any insurer acceptable to us You will deliver to us copies of the insurance policy or policies or a certificate of insurance within thirty (30) days of the date of this Agreement. If you fail to do so or fail to pay the insurance premiums, we may obtain the insurance covering our interest. If we do this, any such amounts shall be assessed to your Account as Advances which will reduce the amount of available credit and you agree to pay such additional Advances. Such amounts may not be covered by the Security Instrument you have granted to us.

**25. Reappraisal:** You agree that we have the right to inspect and reappraise any Property which secures Advances made under this Agreement, for as long as the Agreement is in effect or as long as any balance owed under the Agreement is still outstanding. If requested, you will give us permission to enter your dwelling and other Property to inspect and reappraise We will conduct our inspection upon reasonable notice and at reasonable times  We may charge your Account for any costs that we incur in obtaining any reappraisal or in the appraisal review process, even if performed by our employees, up to a maximum of $ 400.00

**26. Liability:** We have no responsibility for the refusal of any merchants, banks or others to honor the KeyEquity Card and Checks or for any goods or services purchased through the use of your Account.

**27. Events of Default:** The entire Account balance including  any amount owing on the Variable Rate Portion and all Fixed Rate Options will, at our option, become immediately due and payable, after any notice to you required by applicable law, in the event that (a) you fail to meet the repayment terms of this Agreement for any outstanding balance, or (b) there is any fraud or misrepresentation by you at any time in connection with this Account or (c) any action or inaction by you which adversely affects our security or any of our rights in such security. Any action or inaction by you which adversely affects our security, includes, but is not limited to, transfer of title to the Property, sale of the Property without our prior written consent, failure to maintain required insurance on the Property, commission of waste or destructive use of the Property, failure to maintain the Property such that it adversely affects our security, failure to pay taxes on the Property or other action which results in the filing of a senior lien on the Property, your death, the taking of the Property through eminent domain or illegal use of the Property

Our failure to immediately and permanently terminate the Account or accelerate payment or take other permitted actions set forth above shall not prohibit us from taking such action at a later time, as long as the condition still exists at that time. We may prohibit additional Advances or reduce your Credit Limit in the event that (a) the value of the dwelling that secures the Account declines significantly below the Property's appraised value for purposes of the Account  For purposes of this paragraph, a decline in value shall be significant if the value of the dwelling declines such that the initial difference between the Credit Limit and the available equity (based on the Property's appraised value for purposes of the Agreement) is reduced by fifty percent (50%) or more  For example, assume a house with a first mortgage/deed of trust of $50,000 appraised at $100,000 and the credit limit is $30,000  The difference between the credit limit and the available equity is $20,000 ($50,000 - $30,000)  If the Property value declines from $100,000 to $90,000, we could prohibit further Advances, (b) we reasonably believe you will be unable to fulfill the repayment obligations under this Agreement due to a material change in your financial circumstances, (c) you are in default of any material obligations under this Agreement; (d) we are precluded by government action from imposing the APR provided for in the Agreement, (e) the priority of our security interest is adversely affected by government action to the extent that the value of the security interest is less than 120% of the Credit Limit; (f) we are notified by our regulatory agency that continued Advances constitute an unsafe or unsound practice, or (g) the maximum APR is reached

In order to reinstate the Agreement, you must send us a written request to that effect.  We will only reinstate the Account if we determine to our satisfaction that the condition or reason which caused us to prohibit Advances or to reduce the Credit Limit either no longer exists or has been corrected.  If an appraisal or title report is required to make such determination, we may charge you for any such fee(s), which will be billed to your Account as an Advance and will not exceed $400.00

**28. No Waiver of Rights:** We may accept late payments or partial payments marked "payment in full" without losing any of our rights under this Agreement  The waiver of any of our rights and remedies at any time will not mean that we have given up or lost the right to exercise any of our rights and remedies at any later time  We may delay in enforcing any of our

Page 5

Line #
ACAPS #

## KEY EQUITY OPTIONS AGREEMENT

rights and remedies under this Agreement without losing them. Failure by us to assert any of our rights shall not waive such rights. We may also take any collection action allowed by law.

**29. KeyEquity Card Access: (THE KEY EQUITY CARD IS NOT AVAILABLE IN NEW YORK.)** If you received a KeyEquity Card with this Agreement, you may access credit available under the Account by using the KeyEquity Card to make purchases, obtain Advances, or obtain cash from automated teller or cash dispensing machine(s) ("Terminal"), subject to the following restrictions

**A.** If we issue a personal Identification number ("PIN") to you, you may use the KeyEquity Card at a Terminal identified by a service mark appearing on the KeyEquity Card to obtain cash advances only, subject to the limits on amount and frequency, and payment of any surcharge, imposed by the Terminal owner/operator from time to time.
**B.** You may be liable for the unauthorized use of the KeyEquity Card. You agree to notify us promptly, orally or in writing, if the KeyEquity Card is lost or stolen. You may notify us by writing to. Card Service Center, P. O Box 810012, Toledo, Ohio 43081, or by calling us at 1-800-KEY2YOU (1-800-539-2968) We may charge a fee to replace your KeyEquity Card Your KeyEquity Card is a credit card, and your liability for unauthorized use of the KeyEquity Card will be limited to the amount of money, property, labor or services obtained by unauthorized use before you notify us, up to a maximum of $50 00. Your liability may be reduced under a network rule of MasterCard International Inc. This rule currently provides that a Cardholder's liability for unauthorized use of a MasterCard-branded credit card or debit card issued by KeyBank may be reduced to zero dollars ($0) if (a) the cardholder (i) has reported to KeyBank the loss or theft of the MasterCard-branded card within twenty-four hours of the Cardholder's discovery of such loss or theft, (ii) has exercised reasonable care in safeguarding the Card from risk of loss or theft, and (iii) has not reported two or more incidents of unauthorized use in the immediately preceding twelve-month period, and (b) the Cardholder's account (to which Card transactions are posted) is in good standing. Under this rule, "unauthorized use" means use of this Card by a person, other than the Cardholder, who does not have actual, implied, or apparent authority for such use, and from which the Cardholder receives no benefit. This rule does not apply to a Card issued (i) to an entity other than a natural person, (ii) primarily for business, commercial, or agricultural purposes, or (iii) outside the U S A
**C.** You agree not to assert against us any claims or defenses you may have against any person who honors the KeyEquity Card which arise out of an unresolved dispute as to Property or services rented or purchased with the KeyEquity Card in any credit card transaction (as that term is defined in Federal Reserve Board Regulation Z), unless all of the following conditions are met (1) the claim is not a tort claim, (2) you have made a good faith attempt to resolve the dispute with the person who honored the KeyEquity Card, (3) the amount of the credit extended to obtain the property or services that resulted in the claim or defense exceeds $50.00, and (4) the purchase or rental transaction occurred in the same state as your current designated mailing address or, if not within the same state, within one hundred miles of that address. You hereby agree transactions made by telephone use of a KeyEquity Card will be deemed to have occurred at the merchant's sales location rather than at your mailing address or the location of the telephone used to make the phone call. You further agree not to assert against us any claim based on anyone's refusal to honor the KeyEquity Card.
**D.** We are not responsible if a merchant, another bank, or a Terminal refuses to honor the KeyEquity Card or transaction. Such refusal may also be due to our inability or unwillingness to authorize the transaction for any reason. The limits on amount and frequency of transactions that we may authorize may be changed by us, and we may impose other conditions from time to time for security reasons to protect and benefit you. We will not be responsible if authorization for any transaction is not given, and you agree not to assert any claim against us based on any such refusal to honor the KeyEquity Card Your KeyEquity Card will expire upon the earlier of the expiration date specified on said Card or expiration of the draw period for available credit under the Agreement.
**E.** Use of the KeyEquity Card is subject to all procedures established by us, or by a participating merchant or bank, or owner or operator of a Terminal which honors the KeyEquity Card. We have the right, at our sole discretion, to deny any transaction which would result in an outstanding principal balance in excess of the Credit Limit. You agree that any KeyEquity Card(s) issued remain our Property and shall be destroyed by you, or may be retrieved by us or our agent, upon cancellation of the Agreement or cancellation of credit available on the Account.
**F.** Each credit extension made in connection with any transaction at a Terminal or cash advance at a Terminal will be an Advance under the Account and will be repayable by all who have signed or otherwise agreed to this Agreement as a "borrower". You and each other borrower will be jointly and severally liable regardless of how many KeyEquity Card(s) are issued and regardless of whether all applicants receive KeyEquity Cards. If anyone uses your KeyEquity Card with actual, apparent or implied authority, or you benefit from the use of the KeyEquity Card, you will be liable for all Advances extended to or for the benefit of that person
**G** We reserve the right, from time to time and without notice to you, to limit, restrict, terminate or otherwise modify the KeyEquity Card access to your Account, as well as the terms and conditions in this Agreement governing such access, as long as we allow you to continue to have the right to obtain cash advances on your Account in those other methods and procedures further described in Agreement and to the extent permitted by applicable law

**30. Cancellation:** You may close your Account as to future transactions at any time by giving us written notice at the address printed on page one of this Agreement. If we issue you a KeyEquity Card or Checks to use to obtain Advances, you agree to be liable for all Advances obtained by any person who uses the KeyEquity Card or Checks with your permission. If we terminate your Account or you close your Account, you must cut up your KeyEquity Card and return the KeyEquity Card and Checks to us. We may cancel your Account pursuant to the terms and conditions of the Agreement set forth above

The closing or cancellation of your Account for whatever reason will not affect your obligations prior to such closing or cancellation. The terms of the Agreement shall continue to apply to the outstanding balance on your Account until paid in full, except that the Repayment Period will commence at the time of closing or cancellation. Use of the Account after termination or notice of cancellation is fraudulent and you may be subject to legal proceedings

**31. Tax Deductibility:** You should consult a tax advisor regarding the deductibility of interest and charges under the Account.

UN_KBNA KEOP/KEOH Agreement
Rev 02/2007

Line #
ACAPS #

## KEY EQUITY OPTIONS AGREEMENT

**32. Disclosure of Account Information:** We may share information within the KeyCorp family of companies as well as with unaffiliated third parties external to Key as described in our Privacy Policy. **You specifically consent to us sharing information within the KeyCorp family of companies and with external unaffiliated third parties.** You may elect to opt out of information sharing as described in our Privacy Policy. If you elect to opt out, that election will override this consent to share, except for those instances in which we are otherwise permitted to share by law without your consent.

**33. Review of Credit Line:** You agree to provide us with updated financial information including but not limited to personal financial statements, upon request. This requirement constitutes a material obligation under this Agreement. Failure to provide any such requested updated financial information to us within thirty (30) days of the request shall constitute a default under this Agreement. You agree to inform us in writing of any material change in your financial situation, or any change of your home or mailing address, or if you change your name, within thirty (30) days after such change. You agree we may, from time to time, obtain an updated credit report on you without first notifying you or obtaining your consent.

**34. Stop Payment Procedures:** At your risk and written request, we will, without responsibility on our part so far as we may lawfully limit our liability, accept a stop payment on your Account. An oral stop payment order is binding for only fourteen (14) days unless confirmed in writing within that period. No revocation of the request to stop payment shall be valid unless delivered to us in writing. In order to place a written stop payment request, you must inform us of the exact amount of the item, the number of the check, the date of the check, your Account number, and any other information requested. A stop payment request is effective for only six (6) months, unless you renew it. We are not liable for payment of a check or if a stop payment request has expired and not been renewed, if you have not given us sufficient information or if your stop payment request comes too late for us to act on it. We are entitled to a reasonable period of time after we receive your stop payment request to notify our employees and take other action needed to stop payment. You agree that "reasonable time" depends on the circumstances but that we will have acted within a reasonable time if we make your stop payment request effective by the end of the next business day following the business day on which we receive your stop payment request.

**35. Monthly Statement; Limitation on Time to Report Forgeries and Errors:** We will send you a monthly statement for each monthly billing cycle when there is a debit or credit balance of more than $1.00 or when a Finance Charge has been imposed unless your Account is deemed to be uncollectible. The statement will show the number of days in the billing cycle, the beginning balance and the ending (new) balance. The statement will also show the minimum payment amount, the payment due date and your available credit. Your Advances, payments, other charges such as annual membership fees or late charges, or other adjustments will be described as applicable. Any finance charges that you owe will also be shown. You should review your statements promptly after you receive them. You must notify us as soon as possible if you believe there is an error, forgery or other problem with the information shown on your Account statement. You agree that fifteen (15) days after we mailed a statement is a reasonable amount of time for you to review your Account statement and report any errors, forgeries or other problems. This time limit will not affect any rights you may have under the Electronic Fund Transfer Act or the Fair Credit Billing Act (see "Your Billing Rights" notice in this Agreement). In addition, you agree not to assert a claim against us concerning any error, forgery or other problem relating to a matter shown on an Account statement unless you notify us of the error, forgery or other problem within sixty (60) days after we mailed you the statement.

**36. Stop Future Advances:** Each person who signs this Agreement may request us not to permit any additional Advances under the Account. We may continue to honor requests until we have had reasonable time to act upon your request. You agree that we do not guarantee that every request for a future Advance will be rejected after your request. Future Advances may not be obtained until all owners request us in writing to reactivate your Account. If your request is given by telephone, we may require you to confirm the request in writing. You will hold us harmless from any claim by any party for either stopping payment on checks or for ceasing to honor requests for Advances. You will resolve any such claims and will reimburse us for all expenses that we incur in defending any actions or claims brought against us, including reasonable attorneys' fees, whether or not a lawsuit is commenced.

**37. Giving of Notices:** Any notice that must be given under this Agreement will be delivered or mailed to your address shown on our records. Any mailed notice will be considered delivered when actually received or on the third business day after it is mailed, whichever is earlier. Any notice, other than credit card related notices, you send to us is to be sent to the address shown on your monthly statement, unless we notify you otherwise in writing.

**38. Assignment/Severability Clause:** You cannot assign or transfer your rights or obligations under this Agreement to another person. Your Account is not assumable. This is a material obligation. If you attempt to assign your rights or obligations, we can restrict your right to obtain Advances, reduce your Credit Limit, and/or terminate this Agreement and require you to pay us the outstanding balance in full at once. We may assign or transfer this Agreement and the Security Instrument to another party without your consent.

If any provision of this Agreement or Security Instrument is held by a court to be invalid or unenforceable, the rest of this Agreement will remain in full force and effect and enforceable according to its terms.

**39. Taxes, Insurance and Senior Liens:** You promise to pay all senior liens (those recorded before ours), taxes, assessments and other charges on the Property when due.

**40. Governing Law:** You understand that KeyBank is a national bank with its main office located in Cleveland, Ohio. Consequently, except as provided in the following sentence, this Agreement shall be governed by Federal law and the laws of the State of Ohio, without regard for conflict of law rules. The laws of the state where you opened your Account will apply as provided in Section 103(b)(1) of the Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994, but only to the extent such state laws are not preempted by Federal law or a determination of a discriminatory effect by the Comptroller of the Currency.

Page 7

# KEY EQUITY OPTIONS AGREEMENT

**41. Amendments:** We may amend or modify the terms and conditions of this Agreement in our sole discretion in the following ways at any time upon written notice to you. (1) make specified changes provided for in the Agreement that will occur upon the happening of specified events, (2) change the Index and Margin used under the Agreement if the original Index is no longer available, (3) make a change that will unequivocally benefit you throughout the remainder of the Agreement, including but not limited to extension of the Draw Period, and (4) make insignificant changes, including, but not limited to, changes in balance computation method or payment due date

**42. Waiver of Right to Set-Off:** We waive our right to set-off your indebtedness incurred under this Agreement arising solely from use of the KeyEquity Card against any deposit account not specifically pledged to secure the Account and held by us to the extent such right to set-off is prohibited under Regulation Z adopted by the Federal Reserve Board

**43. Notice to Alaska Customers:** The undersigned borrower has executed a Deed of Trust to the benefit of KeyBank National Association. Pursuant to Alaska Statute 34.20.160, the undersigned acknowledges and understands as follows·

The "Mortgagor or Trustor" (Borrower) is personally obligated and fully liable for the amount due under the Agreement The "Mortgagee or Beneficiary" (Bank) has the right to sue on the Agreement and obtain a personal judgment against the Mortgagor or Trustor for satisfaction of the amount due under the Agreement, either before or after a judicial foreclosure of the Mortgage or Deed of Trust under AS 09 45 170-09 45 220

As referred to herein, "Mortgagor or Trustor" is the Borrower under the Agreement and Trustor under the Mortgage or Deed of Trust; "Mortgagee or Beneficiary" is KeyBank National Association, its assignees or successor in interest

**44. Credit Record: (Notice for Utah Customers.)** As required by Utah Law, you are hereby notified that a negative credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations

**45. Your Billing Rights:** This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act. Notify us in case of errors or questions about your bill.  If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at the address listed on your bill  Write to us as soon as possible.  We must·hear from you no later than sixty (60) days after we sent you the first bill on which the error or problem appeared  You can telephone us, but doing so will not preserve your rights

In your letter, give us the following information·
- Your name and account number
- The dollar amount of the suspected error.
- Describe the error and explain, if you can, why you believe there is an error  If you need more information, describe the item you are not sure about

If you have authorized us to pay your bill automatically from your savings or checking account, you can stop the payment on any amount you think is wrong  To stop the payments your letter must reach us three (3) business days before the automatic payment is scheduled to occur

**Your Rights and Our Responsibilities After We Receive Your Written Notice.**
We must acknowledge your letter within thirty (30) days, unless we have corrected the error by then  Within ninety (90) days, we must either correct the error or explain why we believe the bill was correct

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent.  We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your credit limit  You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.
If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount  If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount  In either case, we will send you a statement of the amount you owe and the date that it is due

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten (10) days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill  And, we must tell you the name of anyone we reported you to  We must tell anyone we report you to that the matter has been settled between us when it finally is
If we don't follow these rules, we can't collect the first $50 of the questioned amount even if your bill was correct

**Special Rule for Credit Card Purchases.**

If you have a problem with the quality of property or services that you purchased with a credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or services  There are two limitations on this right  (a) you must have made the purchase in your home state or, if not within your home state, within 100 miles of your current mailing address, and (b) the purchase price must have been more than $50 00  These limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement for the property or services

UN_KBNA KEOP/KEOH Agreement
Rev 02/2007

## KEY EQUITY OPTIONS AGREEMENT

**FINAL EXPRESSION** This written Agreement is the final expression of the agreement and understanding of the parties with respect to the general subject matter hereof and supersedes any previous understanding, negotiations or discussions, whether written or oral This written Agreement may not be contradicted by evidence of any alleged oral agreement

**You agree to be bound by all of the above terms and conditions as set forth in this Agreement and acknowledge receipt of a completed copy of this Agreement**

Borrower: _____     Borrower: _____
LARRY E. WEINSTEIN                     LINDA WEINSTEIN

Date: November 26, 2007                Date: November 26, 2007

Borrower: _____     Borrower: _____

Date: _____         Date: _____

---

**VERMONT NOTICE TO COSIGNER**
**NOTICE TO COSIGNER: YOUR SIGNATURE ON THIS NOTE MEANS THAT YOU ARE EQUALLY LIABLE FOR REPAYMENT OF THIS LOAN. IF THE BORROWER DOES NOT PAY, THE LENDER HAS A LEGAL RIGHT TO COLLECT FROM YOU.**

By signing below, you state that you have read this Note, you have received a copy of this Note for your records, you agree to the terms and conditions of this Note, and you also agree to be absolutely and unconditionally responsible for paying all amounts owed under this Note, in full, whenever such amounts become due, and for otherwise performing all obligations under this Note

_____
Guarantor Signature

_____
Guarantor Name (Please Print)

---

**Agreements secured by Property in the State of Florida only:**

**STATE OF FLORIDA DOCUMENTARY STAMP TAXES IN THE AMOUNT REQUIRED BY LAW WILL BE PAID UPON THE RECORDING OF THE MORTGAGE SECURING THIS AGREEMENT.**

UN_KBNA KEOP/KEOH Agreement
Rev 02/2007

Line #
ACAPS #

# HOME EQUITY LINE OF CREDIT
# MORTGAGE

| BORROWER | MORTGAGOR |
|---|---|
| LARRY B. WEINSTEIN<br>LINDA WEINSTEIN | LARRY B. WEINSTEIN<br>LINDA WEINSTEIN    This property will be improved by<br>a 1 or 2 family dwelling only. |
| **ADDRESS** | **ADDRESS** |
| 7 STILLO DR<br>AIRMONT, NY 10952 | 7 STILLO DR<br>AIRMONT, NY 109524149    Property Address is the Mailing Add... |
| TELEPHONE NO.          IDENTIFICATION NO. | TELEPHONE NO.          IDENTIFICATION NO. |

THIS IS A LINE OF CREDIT MORTGAGE AS DEFINED IN SECTION 281 OF THE REAL PROPERTY LAW. THE PARTIES TO THIS MORTGAGE REASONABLY CONTEMPLATE ENTERING INTO A SERIES OF ADVANCES OR ADVANCES, PAYMENTS AND READVANCES. THE MAXIMUM AMOUNT AUTHORIZED TO BE OUTSTANDING AT ANY ONE TIME IS STATED BELOW.

WORDS USED OFTEN IN THIS DOCUMENT

(a) "Security Instrument." This document, which is dated __November 26, 2007__ , will be called the "Security Instrument."

(b) "Borrower." The Borrower(s) are identified above  If any or all of the Borrowers and the Mortgagors described above are the same person(s), then all references to Mortgagor in this Mortgage shall apply to such Borrower.

(c) "Lender." __KeyBank National Association__
__4910 Tiedeman Road, Suite C, Brooklyn, Ohio  44144__

(d) "Mortgagor."  The Mortgagor(s) are identified above  If any or all of the Mortgagor(s) described above are the same person(s), then all references to Borrower in this Mortgage shall apply to such Mortgagor(s).  If any one Mortgagor does not sign the promissory notes or agreements evidencing the Obligations described below:

(i)  that Mortgagor is signing this Security Instrument only to give that Mortgagor's rights in the Property under the terms of this Security Agreement;

(ii)  that Mortgagor is not personally obligated to pay the Obligations; and

(iii)  that Mortgagor agrees that Lender may agree with the other Mortgagors to delay enforcing any of Lender's rights or to modify or to make any accommodations with regard to the terms of this Security Instrument or the Obligations without that Mortgagor's consent.

(e) "Obligations." The following promissory note(s) and other agreement(s) signed by the Borrower:

| INTEREST<br>RATE | PRINCIPAL AMOUNT/<br>CREDIT LIMIT | FUNDING/<br>AGREEMENT DATE | MATURITY<br>DATE | CUSTOMER<br>NUMBER | LOAN<br>NUMBER |
|---|---|---|---|---|---|
| VARIABLE | $250,000.00 | 11/30/07 | 11/30/42 | | |

(f) "Property."  The property that is described in Schedule A and in the section titled "Description of the Property," will be called the "Property."

(g) "Sums Secured."  The amounts described below in the section titled "Mortgagor's Transfer to Lender of Rights in the Property" sometimes will be called the "Sums Secured."

MORTGAGOR'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY

Mortgagor mortgages, grants and conveys the Property to Lender subject to the terms of this Security Instrument.  This means that, by signing this Security Instrument, Mortgagor is giving Lender those rights that are stated in this Security Instrument and also those rights that the law gives to lenders who hold mortgages on real property.  Mortgagor is giving Lender these rights to protect Lender from possible losses that might result if Mortgagor or Borrower fails to:

(a) Pay, with interest, all the amounts owed Lender, as stated in the promissory notes and agreements, and any extensions, modifications and/or renewals (including any extensions, modifications and/or renewals that amend the Draw Period) of such promissory notes and agreements, which evidence the Obligations;

(b) Pay, with interest, any amounts that Lender spends under Paragraphs 2 and 6 of this Security Instrument to protect the value of the Property and Lender's rights in the Property; and

(c) Keep all other promises and agreements under this Security Instrument.

This Mortgage shall secure existing debts Borrower may now owe Lender and any future advances under the Obligations, whether the Lender is obligated to make such future advances or whether they may be made at the Lender's option, as if such future advances were made on the date Mortgagors signed this Mortgage  The Sums Secured shall not exceed at any time the maximum principal amount of $ 250,000.00 plus interest, plus any advances made for the payment of taxes, levies or insurance on the Property with interest.  Any such future advances may be made either prior to or after the due dates of the Obligations secured by this Mortgage  This Mortgage is given for the specific purpose of securing any and all indebtedness of the Borrower and the Mortgagor to Lender (but in no event shall the secured indebtedness exceed at any time the maximum principal amount set forth in this paragraph) in whatever manner this indebtedness may be evidenced or represented until this Mortgage is satisfied of record.  All covenants and agreements contained in this Mortgage shall be applicable to all advances made by Lender to Borrower or Mortgagor under this future advance clause

DESCRIPTION OF THE PROPERTY

Mortgagor gives Lender rights in the Property described in Schedule A which is attached to and part of this Mortgage, and.

(a) All buildings and other improvements that are located on the Property described in Schedule A,

(b) All rights in other property that Mortgagor has as owner of the Property described in Schedule A.  These rights are known as "easements and appurtenances attached to the Property";

(c) All rights that Mortgagor has in the land which lies in the streets or roads in front of, or next to, the Property described in Schedule A,

(d) All fixtures that are now or in the future will be on the Property described in Schedule A,

(e) All of the rights and Property described in subparagraphs (a) through (d) of this section that Mortgagor acquires in the future, and

(f) All replacements of or additions to the Property described in subparagraphs (a) through (e) of this section.

PARCEL-BLOCK-LOT #:

LPNY506 © Harland Financial Solutions, Inc. (8/23/06)  (800) 937-3799

Section W.003 Block 0001 Lot 021.003

**MORTGAGOR'S RIGHT TO MORTGAGE THE PROPERTY AND MORTGAGOR'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY**
Mortgagor promises that (a) Mortgagor owns the Property, (b) Mortgagor has the right to mortgage, grant and convey the Property to Lender; and (c) there are no outstanding claims or charges against the Property, except for those which are of public record, which are described in Schedule B.

Mortgagor gives a general warranty of title to Lender. This means that Mortgagor will be fully responsible for any losses which Lender suffers because someone other than Mortgagor has some of the rights in the Property which Mortgagor promises that Mortgagor has Mortgagor promises that Mortgagor will defend Mortgagor's ownership of the Property against any claims of such rights.

**PLAIN LANGUAGE SECURITY INSTRUMENT**
This Security Instrument contains promises and agreements that are used in real property security instruments all over the country It also contains other promises and agreements that vary, to a limited extent, in different parts of the country Mortgagor's promises and agreements are stated in "plain language "

**COVENANTS**

Mortgagor promises and agrees with Lender as follows.

**1. BORROWER'S PROMISE TO PAY**
Borrower has promised to pay to Lender on time principal and interest due under the Obligations and any prepayment and late charges due under the Obligations.

**2. PAYMENTS FOR TAXES AND INSURANCE**
Mortgagor will pay all amounts necessary to pay for taxes, assessments, water frontage charges and other similar charges, sewer rents, leasehold payments or ground rents (if any), hazard or property insurance covering the Property, and flood insurance (if any)

**3. MORTGAGOR'S OBLIGATION TO PAY CHARGES, ASSESSMENTS AND CLAIMS**
Mortgagor will pay all taxes, assessments, water frontage charges and other similar charges, sewer rents, and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument. Mortgagor will also make payments due under Mortgagor's lease if Mortgagor is a tenant on the Property and Mortgagor will pay ground rents (if any) due on the Property Mortgagor will do this either by making the payments to Lender that are described in Paragraph 2 above or, if Mortgagor is not required to make payments under Paragraph 2, by making the payments on time to the person owed them (in this Security Instrument, the word "person" means any person, organization, governmental authority or other party ) If Mortgagor makes direct payments, then promptly after making any of those payments Mortgagor will give Lender a receipt which shows that Mortgagor has done so If Mortgagor makes payment to Lender under Paragraph 2, Mortgagor will give Lender all notices or bills that Mortgagor receives for the amounts due under this Paragraph 3

Mortgagor will promptly pay or satisfy all liens against the Property that may be superior to this Security Instrument However, this Security Instrument does not require Mortgagor to satisfy a superior lien if: (a) Mortgagor agrees, in writing, to pay the obligation which gave rise to the superior lien and Lender approves the way in which Mortgagor agrees to pay that obligation; or (b) in good faith, Mortgagor argues or defends against the superior lien in a lawsuit so that, during the lawsuit, the superior lien may not be enforced, or (c) Mortgagor secures from the holder of that other lien an agreement, approved in writing by Lender, that the lien of this Security Instrument is superior to the lien held by that person. If Lender determines that any part of the Property is subject to a superior lien, Lender may give Mortgagor a notice identifying the superior lien Mortgagor shall pay or satisfy the superior lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**4. MORTGAGOR'S OBLIGATION TO MAINTAIN HAZARD INSURANCE OR PROPERTY INSURANCE**
Mortgagor will obtain hazard or property insurance to cover all buildings and other improvements that now are or in the future will be located on the Property. The insurance must cover loss or damage caused by fire, hazards normally covered by "extended coverage" hazard insurance policies and other hazards for which Lender requires coverage, including floods and flooding. The insurance must be in the amounts and for the periods of time required by Lender Mortgagor may choose the insurance company, but Mortgagor's choice is subject to Lender's approval Lender may not refuse to approve Mortgagor's choice unless the refusal is reasonable. If Mortgagor does not maintain the insurance coverage described above, Lender may obtain insurance coverage to protect Lender's rights in the Property in accordance with Paragraph 6 below.

All of the insurance policies and renewals of those policies must include what is known as a "standard mortgage clause" to protect Lender. The form of all policies and renewals must be acceptable to Lender. Lender will have the right to hold the policies and renewals. If Lender requires, Mortgagor will promptly give Lender all receipts of paid premiums and renewal notices that Mortgagor receives.

If there is a loss or damage to the Property, Mortgagor will promptly notify the insurance company and Lender If Mortgagor does not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company is called "proceeds." The proceeds will be used to repair or to restore the damaged Property unless (a) it is not economically feasible to make the repairs or restoration, or (b) the use of the proceeds for that purpose would lessen the protection given to Lender by this Security Instrument, or (c) Lender and Mortgagor have agreed in writing not to use the proceeds for that purpose If the repair or restoration is not economically feasible or if it would lessen Lender's protection under this Security Instrument, then the proceeds will be used to reduce the amount that Borrower and/or Mortgagor owes to Lender under the Obligations and then to the amount Mortgagor owes to Lender under this Security Instrument If any of the proceeds remain after any amount that Mortgagor owes to Lender has been paid in full, the remaining proceeds will be paid to Mortgagor

If Mortgagor abandons the Property, or if Mortgagor does not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may collect the proceeds. Lender may use the proceeds to repair or restore the Property or to pay the Sums Secured. The 30-day period will begin when the notice is given

If any proceeds are used to reduce the amount of principal which Borrower and/or Mortgagor owes to Lender under the Obligations, that use will not delay the due date or change the amount of any of the payments under the Obligations and under Paragraphs 1 and 2 above.

If Lender acquires the Property under Paragraph 19 below, all of Mortgagor's rights in the insurance policies will belong to Lender. Also, all of Mortgagor's rights in any proceeds which are paid because of damage that occurred before the Property is acquired by Lender or sold will belong to Lender. However, Lender's rights in those proceeds will not be greater than the Sums Secured immediately before the Property is acquired by Lender or sold

**5. MORTGAGOR'S OBLIGATIONS TO MAINTAIN AND PROTECT THE PROPERTY, AND TO FULFILL ANY LEASE OBLIGATIONS; LOAN APPLICATION**

**(a) Mortgagor's Obligations to Maintain and Protect the Property**
Mortgagor will keep the Property in good repair. Mortgagor will not destroy, damage or harm the Property, and Mortgagor will not allow the Property to deteriorate

Mortgagor will be "in default" under this Security Instrument if Mortgagor fails to keep any promise or agreement made in this Security Instrument. Mortgagor also will be in default under this Security Instrument if any civil or criminal action or proceeding for "forfeiture" (that is, a legal action or proceeding to require the Property, or any part of the Property, to be given up) is begun and Lender determines, in good faith, that this action or proceeding could result in a court ruling (i) that would require forfeiture of the Property or (ii) that would materially impair the lien of this Security Instrument or Lender's rights in the Property. Mortgagor may correct the default by obtaining a court ruling that dismisses the legal action or proceeding, if Lender determines, in good faith, that this court ruling prevents forfeiture of Mortgagor's interests in the Property and also prevents any material impairment of (i) the lien created by this Security Instrument or (ii) Lender's rights in the Property. If Mortgagor corrects the default, Mortgagor will have the right to have enforcement of this Security Instrument discontinued, as provided in Paragraph 16 below, even if Lender has required immediate payment in full.

**(b) Mortgagor's Obligations to Fulfill Any Lease Obligations**
If Mortgagor does not own but is a tenant on the Property, Mortgagor will fulfill all Mortgagor's obligations under the lease. Mortgagor also agrees that, if Mortgagor acquires the fee title to the Property, Mortgagor's lease interest and the fee title will not merge unless Lender agrees to the merger in writing.

**(c) Loan Application**
If, during the application process for the Obligations, Borrower made false or inaccurate statements to Lender about information important to Lender in determining Borrower's eligibility for the loan, Lender will treat this action as a default under this Security Instrument. Also, if during the loan application process Borrower fails to provide Lender with information important to Lender in determining Borrower's and/or Mortgagor's eligibility for the loan, Lender will treat this as a default under this Security Instrument.

**6. LENDER'S RIGHT TO PROTECT ITS RIGHTS IN THE PROPERTY**
If  (a) Mortgagor does not keep Mortgagor's promises and agreements made in this Security Instrument, or (b) someone, including Mortgagor, begins a legal proceeding that may significantly affect Lender's rights in the Property (such as a legal proceeding in bankruptcy, in probate, for condemnation or forfeiture, or to enforce laws or regulations), Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property  Lender's actions may include appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs  Although Lender may take action under this Paragraph 6, Lender does not have to do so

Mortgagor will pay to Lender any amounts, with interest, which Lender spends under this Paragraph 6  Mortgagor will pay those amounts to Lender when Lender sends Mortgagor a notice requesting that Mortgagor do so  Mortgagor will also pay interest on those amounts at the highest rate stated in the Obligations.  Interest on each amount will begin on the date that the amount is spent by Lender.  However, Lender and Mortgagor may agree in writing to terms of payment that are different from those in this paragraph.  This Security Instrument will protect Lender in case Mortgagor does not keep this promise to pay those amounts with interest.

**7. LENDER'S RIGHT TO INSPECT THE PROPERTY**
Lender, and others authorized by Lender, may enter on and inspect the Property.  Lender must do so in a reasonable manner and at reasonable times.  Before or at the time an inspection is made, Lender must give Mortgagor notice stating a reasonable purpose for the inspection.

**8. AGREEMENTS ABOUT CONDEMNATION OF THE PROPERTY**
A taking of property by any governmental authority by eminent domain is known as "condemnation."  Mortgagor gives to Lender Mortgagor's right:  (a) to proceeds of all awards or claims for damages resulting from condemnation or other governmental taking of the Property; and (b) to proceeds from a sale of the Property that is made to avoid condemnation  All of those proceeds will be paid to Lender.

If all of the Property is taken, the proceeds will be used to reduce the Sums Secured  If any of the proceeds remain after the amount owed to Lender has been paid in full, the remaining proceeds will be paid to Mortgagor

Unless Lender and Mortgagor agree otherwise in writing, if only a part of the Property is taken, and the fair market value of the Property immediately before the taking either is equal to, or greater than, the amount of the Sums Secured immediately before the taking, the amount owed to Lender will be reduced only by the amount of proceeds multiplied by a fraction  That fraction is as follows.  (a) the total amount of the Sums Secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking.  The remainder of the proceeds will be paid to Mortgagor

Unless Lender and Mortgagor agree otherwise in writing or unless the law requires otherwise, if only a part of the Property is taken, and the fair market value of the Property immediately before the taking is less than the amount of the Sums Secured immediately before the taking, the proceeds will be used to reduce the Sums Secured.

If Mortgagor abandons the Property, or if Mortgagor does not answer, within 30 days, a notice from Lender stating that a governmental authority has offered to make a payment or to settle a claim for damages, Lender has the authority to collect the proceeds.  Lender may then use the proceeds to repair or restore the Property or to reduce the Sums Secured.  The 30-day period will begin when the notice is given.

If any proceeds are used to reduce the amount of principal owed to Lender under the Obligations, that use will not delay the due date or change the amount of any of the payments under the Obligations and under Paragraphs 1 and 2 above

**9. CONTINUATION OF BORROWER'S AND MORTGAGOR'S OBLIGATIONS AND OF LENDER'S RIGHTS**
**(a) Borrower's Obligations**
Lender may allow a person who takes over Borrower's rights and obligations to delay or to change the amount of the payments of principal and interest due under the Obligations or under this Security Instrument  Even if Lender does this, however, that person and Borrower will both still be fully obligated under the Obligations and Mortgagor will still be fully obligated under this Security Instrument

Lender may allow those delays or changes for a person who takes over Borrower's rights and obligations, even if Lender is requested not to do so  Lender will not be required to bring a lawsuit against such a person for not fulfilling obligations under the Obligations or under this Security Instrument, even if Lender is requested to do so

**(b) Lender's Rights**
Even if Lender does not exercise or enforce any right of Lender under this Security Instrument or under the law, Lender will still have all of those rights and may exercise and enforce them in the future.  Even if Lender obtains insurance, pays taxes, or pays other claims, charges or liens against the Property, Lender will have the right under Paragraph 19 below to demand that Mortgagor make immediate payment in full of the amount that Mortgagor owes to Lender under this Security Instrument

**10. OBLIGATIONS OF MORTGAGOR AND OF PERSONS TAKING OVER MORTGAGOR'S RIGHTS OR OBLIGATIONS**
Any person who takes over Mortgagor's rights or obligations under this Security Instrument will have all of Mortgagor's rights and will be obligated to keep all of Mortgagor's promises and agreements made in this Security Instrument.  Similarly, any person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's agreements made in this Security Instrument.

If more than one person signs this Security Instrument as Mortgagor, each Mortgagor is fully obligated to keep all of Mortgagor's promises and obligations contained in this Security Instrument  Lender may enforce Lender's rights under this Security Instrument against each Mortgagor individually or against all Mortgagors together  This means that any one Mortgagor may be required to pay all of the Sums Secured

**11. LOAN CHARGES**
If an Obligation secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Obligation exceed permitted limits:  (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit, and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower  Lender may choose to make this refund by reducing the principal owed under the Obligations or by making a direct payment to Borrower  If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Obligations

**12. NOTICES REQUIRED UNDER THIS SECURITY INSTRUMENT**
Any notice that must be given to Mortgagor under this Security Instrument will be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method.  The notice will be addressed to Mortgagor at the address stated in Schedule A.  A notice will be given to me at a different address if Mortgagor gives Lender a notice of Mortgagor's different address.  Any notice that must be given to Lender under this Security Instrument will be given by mailing it to Lender's address stated in this Mortgage  A notice will be mailed to Lender at a different address if Lender gives Mortgagor a notice of the different address.  A notice required by this Security Instrument is given when it is mailed or when it is delivered according to the requirements of this Paragraph 12 or of applicable law.

**13. LAW THAT GOVERNS THIS SECURITY INSTRUMENT**
This Security Instrument is governed by federal law and the law that applies in the place where the Property is located.  If any term of this Security Instrument or of any Obligation conflicts with the law, all other terms of this Security Instrument and of the Obligation will still remain in effect if they can be given effect without the conflicting term.  This means that any terms of this Security Instrument and of the Obligations which conflict with the law can be separated from the remaining terms, and the remaining terms will still be enforced.

**14. MORTGAGOR'S COPY**
Mortgagor will be given one conformed copy of this Security Instrument.

**15. AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED**
Lender may require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission Lender also may require immediate payment in full if a beneficial interest in Mortgagor is sold or transferred and Mortgagor is not a natural person. However, Lender shall not require immediate payment in full if this is prohibited by federal law on the date of this Security Instrument

**16. MORTGAGOR'S RIGHT TO HAVE LENDER'S ENFORCEMENT OF THIS SECURITY INSTRUMENT DISCONTINUED**
Even if Lender has required immediate payment in full, Mortgagor may have the right to have enforcement of this Security Instrument discontinued. Mortgagor will have this right at any time before sale of the Property under any power of sale granted by this Security Instrument or at any time before a judgment has been entered enforcing this Security Instrument if Mortgagor meets the following conditions:

(a) Mortgagor pays to Lender the full amount that then would be due under this Security Instrument and Borrower pays to Lender the full amount owed under the Obligations as if immediate payment in full had never been required; and

(b) Mortgagor corrects Mortgagor's failure to keep any of Mortgagor's other promises or agreements made in this Security Instrument; and

(c) Mortgagor pays all of Lender's reasonable expenses in enforcing this Security Instrument including, for example, reasonable attorneys' fees to the extent permitted by law; and

(d) Mortgagor does whatever Lender reasonably requires to assure that Lender's rights in the Property, Lender's rights under this Security Instrument, and Mortgagor's obligations under this Security Instrument continue unchanged.

If Mortgagor fulfills all of the conditions in this Paragraph 16, then the Obligations and this Security Instrument will remain in full effect as if immediate payment in full had never been required. However, Mortgagor will not have the right to have Lender's enforcement of this Security Instrument discontinued if Lender has required immediate payment in full under Paragraph 15 above

**17. HOLDER'S RIGHT TO SELL THE NOTES OR AGREEMENTS OR AN INTEREST IN THE NOTES OR AGREEMENTS**
The promissory note(s) or agreement(s) evidencing the Obligations, or an interest in such notes or agreements, together with this Security Instrument, may be sold one or more times. Mortgagor may not receive any prior notice of these sales.

**18. CONTINUATION OF MORTGAGOR'S OBLIGATIONS TO MAINTAIN AND PROTECT THE PROPERTY**
The federal laws and the laws of the jurisdiction where the Property is located that relate to health, safety, or environmental protection are called "Environmental Laws." Mortgagor will not do anything affecting the Property that violates Environmental Laws, and Mortgagor will not allow anyone else to do so

Environmental Laws classify certain substances as toxic or hazardous There are other substances that are considered hazardous for purposes of this Paragraph 18. These are gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. The substances defined as toxic or hazardous by Environmental Laws and the substances considered hazardous for purposes of this Paragraph 18 are called "Hazardous Substances."

Mortgagor will not permit Hazardous Substances to be present on the Property Mortgagor will not use or store Hazardous Substances on the Property, and Mortgagor will not allow anyone else to do so Mortgagor also will not dispose of Hazardous Substances on the Property, or release any Hazardous Substance on the Property, and Mortgagor will not allow anyone else to do so. However, Mortgagor may permit the presence on the Property of small quantities of Hazardous Substances that are generally recognized as appropriate for normal residential use and maintenance of the Property, and Mortgagor may use or store these small quantities on the Property. In addition, unless the law requires removal or other action, the buildings, the improvements and the fixtures on the Property are permitted to contain asbestos and asbestos-containing materials if the asbestos and asbestos-containing materials are undisturbed and "non-friable" (that is, not easily crumbled by hand pressure)

If Mortgagor knows of any investigation, claim, demand, lawsuit or other action by the government or by a private party involving the Property and any Hazardous Substance or Environmental Laws, Mortgagor will promptly notify the Lender in writing. If the government notifies Mortgagor (or Mortgagor otherwise learns) that it is necessary to remove a Hazardous Substance affecting the Property or to take other remedial actions, Mortgagor will promptly take all necessary remedial actions as required by Environmental Laws.

**19. LENDER'S RIGHTS IF BORROWER OR MORTGAGOR FAILS TO KEEP PROMISES AND AGREEMENTS**
If Borrower or Mortgagor fails to keep promises and agreements and except as provided in Paragraph 15 above, Lender may require that Borrower pay immediately the entire amount then remaining unpaid under the Obligations and Mortgagor pay immediately the entire amount due under this Security Instrument. Lender may do this without making any further demand for payment. This requirement is called "immediate payment in full."

If Lender requires immediate payment in full, Lender may bring a lawsuit to take away all of Mortgagor's remaining rights in the Property and have the Property sold At this sale Lender or another person may acquire the Property This is known as "foreclosure and sale" In any lawsuit for foreclosure and sale, Lender will have the right to collect all costs and disbursements and additional allowances allowed by law and will have the right to add all reasonable attorneys' fees to the amount Mortgagor owes Lender, which fees shall become part of the Sums Secured

**20. LENDER'S OBLIGATION TO DISCHARGE THIS SECURITY INSTRUMENT**
When Lender has been paid all amounts due under the promissory notes or agreements evidencing the Obligations and under this Security Instrument, Lender will discharge this Security Instrument by delivering a certificate stating that this Security Instrument has been satisfied Mortgagor will not be required to pay Lender for the discharge, but Mortgagor will pay all costs of recording the discharge in the proper official records.

**21. AGREEMENTS ABOUT NEW YORK LIEN LAW**
Borrower will receive all amounts lent to Borrower by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law. This means that if, on the date this Security Instrument is recorded, construction or other work on any building or other improvement located on the Property has not been completed for at least four months, Borrower will (a) hold all amounts received, and which Borrower has a right to receive from Lender under the Obligations as a "trust fund", and (b) use those amounts to pay for that construction or work before Borrower uses them for any other purpose The fact that Borrower is holding those amounts as a "trust fund" means that for any building or other improvement located on the Property, Borrower has a special responsibility under the law to use the amount in the manner described in this Paragraph 21

**22. ASSIGNMENT OF RENTS**
Mortgagor absolutely and unconditionally assigns and transfers to Lender all of the rents and revenues ("Rents") of the Property, regardless to whom the Rents of the Property are payable. Mortgagor authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Mortgagor shall receive the Rents until (i) Lender has given Mortgagor a notice of default pursuant to this Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only

**23. ADDITIONAL TERMS:**

Mortgagor acknowledges that Mortgagor has read, understands, and agrees to the terms and conditions of this Mortgage, and acknowledges receipt of an exact copy of same.

Dated this 26th day of November 2007

MORTGAGOR LARRY B. WEINSTEIN

LARRY B. WEINSTEIN
MORTGAGOR

MORTGAGOR LINDA WEINSTEIN

LINDA WEINSTEIN
MORTGAGOR

_____          _____
MORTGAGOR                                     MORTGAGOR

_____          _____
MORTGAGOR                                     MORTGAGOR

STATE OF NEW YORK            )
                            ) SS.:
COUNTY OF ROCKLAND          )

On the 26 day of November in the year 2007 before me, the undersigned, personally appeared LARRY B. WEINSTEIN AND LINDA WEINSTEIN personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

ROBERT J. SCHWEIZER
Notary Public, State of New York
My Commission Expires Jan. 12, 2011          _____
REG # 01SC4882171                                Notary Public

---

## SCHEDULE A

The following described real property located in the County of ROCKLAND , State of New York .

See Addendum A

THIS PROPERTY WILL BE
IMPROVED WITH A 1 - 2
FAMILY DWELLING ONLY.

COLLATERAL ADDRESS: 7 STILLO DR AIRMONT, NY 109524149

---

## SCHEDULE B

BORROWER AND LENDER REQUEST THE HOLDER OF ANY MORTGAGE, DEED OF TRUST OR OTHER ENCUMBRANCE WITH A LIEN WHICH HAS PRIORITY OVER THIS MORTGAGE TO GIVE NOTICE TO LENDER, AT LENDER'S ADDRESS SET FORTH ON PAGE ONE OF THIS MORTGAGE, OF ANY DEFAULT UNDER THE SUPERIOR ENCUMBRANCE AND OF ANY SALE OR OTHER FORECLOSURE ACTION.

---

**THIS INSTRUMENT WAS PREPARED BY:**
KeyBank National Association
David G. Fisher

When recorded mail to
*FIRST AMERICAN TITLE INSURANCE*
*LENDERS ADVANTAGE*
*1100 SUPERIOR AVENUE, SUITE 200*
*CLEVELAND, OHIO 44114*
*ATTN: FT1120*

EXHIBIT A

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, WITH THE
BUILDINGS AND IMPROVEMENTS THEREON ERECTED, SITUATE, LYING
AND BEING IN THE TOWN OF RAMAPO, COUNTY OF ROCKLAND AND STATE
OF NEW YORK, BOUNDED AND DESCRIBED AS FOLLOWS:

PARCEL I

BEGINNING AT A POINT IN THE MIDDLE OF THE PUBLIC ROAD KNOWN
AS ECKERSON LANE DISTANT 221 FEET FROM THE MIDDLE OF THE
PUBLIC ROAD LEADING EASTERLY FROM ECKERSON'S CORNERS AND THE
STATE ROAD; RUNNING THENCE ALONG THE MIDDLE OF THE SAID
PRIVATE ROAD NORTH 22 DEGREES 00 MINUTES EAST 215.5 FEET;
RUNNING THENCE SOUTH 68 DEGREES 00 MINUTES EAST AND PASSING
THROUGH A STAKE IN THE EASTERLY SIDE OF THE SAID ECKERSON
LANE AND ALONG THE SOUTH LINE OF LANDS OF C. KRONER A
DISTANCE OF 225 FEET; RUNNING THENCE SOUTH 20 DEGREES 09
MINUTES WEST  216 FEET MORE OR LESS TO THE NORTHERLY LINE OF
LANDS NOW OR FORMERLY OF J. PEIRANO; THENCE NORTH 68 DEGREES
00 MINUTES WEST 232 FEET TO THE POINT OR PLACE OF BEGINNING.

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, WITH THE
BUILDINGS AND IMPROVEMENTS THEREON ERECTED, SITUATE, LYING
AND BEING IN HILLCREST, SPRING VALLEY, ROCKLAND COUNTY, NEW
YORK, MORE PARTICULARLY BOUNDED AND DESCRIBED AS FOLLOWS:

PARCEL II

BEGINNING AT A POINT IN THE WESTERLY LINE OF LANDS NOW OR
FORMERLY OF GOLDMAN, WHICH SAID POINT IS DISTANT 382 FEET
FROM THE CENTER LINE OF ECKERSON LANE ON A COURSE OF SOUTH 70
EAST; RUNNING THENCE ALONG LANDS OF PERANO OR SCHWARTZ NORTH
70 DEGREES WEST 150 FEET TO THE SOUTHEAST CORNER OF LANDS
HERETOFORE CONVEYED BY THE FIRST PARTY TO PAULINE GERSHNOW
AND OTHERS BY DEED DATED AUGUST 9, 1947 AND RECORDED IN THE

EXHIBIT A
(continued)

ROCKLAND COUNTY CLERK'S OFFICE IN LIBER 467 OF DEEDS AT PAGE
582 ON AUGUST 11, 1947; THENCE ALONG SAID LANDS OF GERSHNOW
NORTH 20 DEGREES EAST 216 FEET TO LANDS NOW OR FORMERLY OF
KRONER; THENCE ALONG SAME SOUTH 70 DEGREES EAST 150 FEET TO
LANDS NOW OR FORMERLY OF GOLDMAN; THENCE ALONG SAME SOUTH 16
DEGREES 38 MINUTES WEST 216 FEET TO THE POINT OR PLACE OF
BEGINNING.

PARCELS I AND II WHEN TAKEN TOGETHER ARE FURTHER BOUNDED AND
DESCRIBED AS FOLLOWS IN ACCORDANCE WITH A SURVEY DATED
1-23-02 MADE BY WILLIAM YOUNGBLOOD ASSOCIATES:

BEGINNING AT A POINT ON THE WESTERLY SIDE OF ECKERSON LANE,
SAID POINT BEING DISTANT 203.42 FEET NORTHERLY OF THE
INTERSECTION OF ECKERSON LANE AND ECKERSON ROAD; RUNNING
THENCE:

1. ALONG THE WESTERLY LINE OF ECKERSON LANE NORTH 21 DEGREES
11 MINUTES 24 SECONDS EAST 212.97 FEET TO THE SOUTHWEST
CORNER OF PREMISES N/F RONNER, THENCE;
2. ALONG THE SOUTHERLY LINE OF RONNER, SOUTH 69 DEGREES 40
MINUTES 24 SECONDS EAST 326.66 FEET, THENCE;
3. STILL ALONG THE SAME, SOUTH 69 DEGREES 31 MINUTES 24
SECONDS EAST, 30 FEET, THENCE;
4. SOUTH 18 DEGREES 30 MINUTES 26 SECONDS WEST (ACTUAL)
(SOUTH 16 DEGREES 38 MINUTES 00 SECONDS WEST BY DEED) 216.38
FEET (ACTUAL) (216.00 BY DEED), THENCE;
5. ALONG PREMISES N/F COOPER, WALSH AND ROJAS, NORTH 69
DEGREES 08 MINUTES 31 SECONDS WEST 366.75 FEET  TO THE POINT
OR PLACE OF BEGINNING.

DISTRICT: 392621 SECTION: 061.008 BLOCK: 0001 LOT: 021.003

NOTE: 392621-061-008-0001-021-003-0000

EXHIBIT A
(continued)

Permanent Parcel Number:  PLS. SEE NOTE:
ALEXANDER DUNCAN III AND LARRY WEINSTEIN,
AS TENANTS-IN-COMMON

7 STILLO DRIVE, AIRMONT NY 10952-4149
Loan Reference Number  :
First American Order No:
Identifier: FIRST AMERICAN LENDERS ADVANTAGE

WEINSTEIN
                              NY

FIRST AMERICAN LENDERS ADVANTAGE
MORTGAGE

**Paul Piperato, County Clerk**
1 South Main St Ste 100
New City, NY  10956
(845) 638-5221

# Rockland County Clerk Recording Cover Sheet

**Received From :**
FIRST AMERICAN TITLE
1100 SUPERIOR AVE SUITE 200
CLEVELAND, OH  44114

**Return To :**
FIRST AMERICAN TITLE
1100 SUPERIOR AVE SUITE 200
CLEVELAND, OH  44114

**First GRANTOR**

WEINSTEIN, LARRY B

**First GRANTEE**

KEYBANK NA

**Index Type :** Land Records

**Instr Number :** 2007-00063013

**Book :**                     **Page :**

**Type of Instrument :** Mortgage
**Type of Transaction :** Mtg Type B

**Recording Fee :**                     $54 00

**Recording Pages :**                     9

The Property affected by this instrument is situated in Ramapo, in the County of Rockland, New York

| Mortgage Taxes | |
|---|---|
| **Property Located :** | Ramapo |
| **Serial Number :** | CY10016 |
| **Mortgage Amount :** | $250,000.00 |
| **Basic Tax :** | $1,250.00 |
| **Local Tax :** | $0 00 |
| **Additional Tax :** | $720 00 |
| **Transportation Auth Tax :** | $625.00 |
| **SONYMA :** | $0.00 |
| **County Tax :** | $625 00 |
| **Total :** | $3,220 00 |
| **Total Fees :** | $3,274.00 |

State of New York

County of Rockland

I hereby certify that the within and foregoing was recorded in the Clerk's office for Rockland County, New York

On (Recorded Date)  12/10/2007

At (Recorded Time) · 12 27.11 PM

Doc ID - 017867220009

Paul Piperato, County Clerk

This sheet constitutes the Clerks endorsement required by Section 319 of Real Property Law of the State of New York

19-23827-rdd    Doc 102-1    Filed 05/12/21    Entered 05/12/21 16:36:50    Exhibits
Pg 20 of 42

**Paul Piperato, County Clerk**
1 South Main St Ste 100
New City, NY  10956
(845) 638-5221

# Rockland County Clerk Recording Cover Sheet

**Received From :**
FIRST AMERICAN TITLE
1100 SUPERIOR AVE  #200
CLEVELAND, OH  44114

**Return To :**
FIRST AMERICAN TITLE
1100 SUPERIOR AVE  #200
CLEVELAND, OH  44114

**First GRANTOR**

WEINSTEIN, LARRY B

**First GRANTEE**

KEYBANK NA

**Index Type :** Land Records

**Instr Number :** 2009-00012831

**Orig Instr #:** 2007-00063013

**Book :**              **Page :**

**Type of Instrument :** Correction Mortgage
**Type of Transaction :** Mtg Type D-3

**Recording Fee :**              $80.00

**Recording Pages :**              9

The Property affected by this instrument is situated in Ramapo, in the County of Rockland, New York

### Mortgage Taxes

| | |
|---|---|
| **Property Located :** | Ramapo |
| **Serial Number :** | DA475 |
| **Mortgage Amount :** | $0.00 |

| | |
|---|---|
| **Basic Tax :** | $0.00 |
| **Local Tax :** | $0.00 |
| **Additional Tax :** | $0.00 |
| **Transportation Auth Tax :** | $0.00 |
| **SONYMA :** | $0.00 |
| **County Tax :** | $0.00 |
| **Total :** | $0.00 |
| **Total Fees :** | $80.00 |

State of New York

County of Rockland

I hereby certify that the within and foregoing was recorded in the Clerk's office for Rockland County, New York

On (Recorded Date) : 04/21/2009

At (Recorded Time) :  9:36:34 AM

Doc ID - 019058700009

Paul Piperato, County Clerk



This sheet constitutes the Clerks endorsement required by Section 319 of Real Property Law of the State of New York

Entered By: NAM  Printed On : 04/22/2009   At : 9:38:56AM

WEINSTEIN                    NY

FIRST AMERICAN ELS
REFILE MORTGAGE

**CORRECTIVE**

# HOME EQUITY LINE OF CREDIT MORTGAGE TO CORRECT LEGAL DESCRIPTION, PREVIOUSLY FILED IN INST. NO. 2007-0063013 ON 12/10/07.

| BORROWER | MORTGAGOR |
|---|---|
| LARRY B. WEINSTEIN<br>LINDA WEINSTEIN | LARRY B WEINSTEIN, HUSBAND<br>LINDA WEINSTEIN, WIFE<br><br>**THIS PROPERTY WILL BE IMPROVED<br>BY A 1 OR 2 FAMILY DWELLING ONLY.** |
| **ADDRESS**<br>7 STILLO DR<br>AIRMONT, NY 10952 | **ADDRESS**<br>7 STILLO DR<br>AIRMONT, NY 109524149 |
| TELEPHONE NO.          IDENTIFICATION NO. | TELEPHONE NO.          IDENTIFICATION NO. |

THIS IS A LINE OF CREDIT MORTGAGE AS DEFINED IN SECTION 281 OF THE REAL PROPERTY LAW. THE PARTIES TO THIS MORTGAGE REASONABLY CONTEMPLATE ENTERING INTO A SERIES OF ADVANCES OR ADVANCES, PAYMENTS AND READVANCES. THE MAXIMUM AMOUNT AUTHORIZED TO BE OUTSTANDING AT ANY ONE TIME IS STATED BELOW.

**WORDS USED OFTEN IN THIS DOCUMENT**
(a) "Security Instrument." This document, which is dated __November 26, 2007__ , will be called the "Security Instrument."

(b) "Borrower." The Borrower(s) are identified above. If any or all of the Borrowers or the Mortgagors described above are the same person(s), then all references to Mortgagor in this Mortgage shall apply to such Borrower.

(c) "Lender." __KeyBank National Association__
__4910 TIEDEMAN ROAD, BROOKLYN, OHIO  44144__

(d) "Mortgagor." The Mortgagor(s) are identified above. If any or all of the Mortgagor(s) described above are the same person(s), then all references to Borrower in this Mortgage shall apply to such Mortgagor(s). If any one Mortgagor does not sign the promissory notes or agreements evidencing the Obligations described below:

(i)  that Mortgagor is signing this Security Instrument only to give that Mortgagor's rights in the Property under the terms of this Security Agreement;

(ii)  that Mortgagor is not personally obligated to pay the Obligations; and

(iii)  that Mortgagor agrees that Lender may agree with the other Mortgagors to delay enforcing any of Lender's rights or to modify or to make any accommodations with regard to the terms of this Security Instrument or the Obligations without that Mortgagor's consent.

(e) "Obligations." The following promissory note(s) and other agreement(s) signed by the Borrower:

| INTEREST RATE | PRINCIPAL AMOUNT/ CREDIT LIMIT | FUNDING/ AGREEMENT DATE | MATURITY DATE | CUSTOMER NUMBER | LOAN NUMBER |
|---|---|---|---|---|---|
| VARIABLE | $250,000.00 | 11/30/07 | 11/30/42 | | |

(f)  "Property." The property that is described in Schedule A and in the section titled "Description of the Property," will be called the "Property."

(g)  "Sums Secured." The amounts described below in the section titled "Mortgagor's Transfer to Lender of Rights in the Property" sometimes will be called the "Sums Secured."

**MORTGAGOR'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY**
Mortgagor mortgages, grants and conveys the Property to Lender subject to the terms of this Security Instrument. This means that, by signing this Security Instrument, Mortgagor is giving Lender those rights that are stated in this Security Instrument and also those rights that the law gives to lenders who hold mortgages on real property. Mortgagor is giving Lender these rights to protect Lender from possible losses that might result if Mortgagor or Borrower fails to:

(a)  Pay, with interest, all the amounts owed Lender, as stated in the promissory notes and agreements, and any extensions, modifications and/or renewals (including any extensions, modifications and/or renewals that amend the Draw Period) of such promissory notes and agreements, which evidence the Obligations;

(b)  Pay, with interest, any amounts that Lender spends under Paragraphs 2 and 6 of this Security Instrument to protect the value of the Property and Lender's rights in the Property; and

(c)  Keep all other promises and agreements under this Security Instrument.

This Mortgage shall secure existing debts Borrower may now owe Lender and any future advances under the Obligations, whether the Lender is obligated to make such future advances or whether they may be made at the Lender's option, as if such future advances were made on the date Mortgagors signed this Mortgage. The Sums Secured shall not exceed at any time the maximum principal amount of $ __250,000.00__ plus interest, plus any advances made for the payment of taxes, levies or insurance on the Property with interest. Any such future advances may be made either prior to or after the due dates of the Obligations secured by this Mortgage. This Mortgage is given for the specific purpose of securing any and all indebtedness of the Borrower and the Mortgagor to Lender (but in no event shall the secured indebtedness exceed at any time the maximum principal amount set forth in this paragraph) in whatever manner this indebtedness may be evidenced or represented until this Mortgage is satisfied of record. All covenants and agreements contained in this Mortgage shall be applicable to all advances made by Lender to Borrower or Mortgagor under this future advance clause.

**DESCRIPTION OF THE PROPERTY**
Mortgagor gives Lender rights in the Property described in Schedule A which is attached to and part of this Mortgage, and:

(a)  All buildings and other improvements that are located on the Property described in Schedule A;

(b)  All rights in other property that Mortgagor has as owner of the Property described in Schedule A. These rights are known as "easements and appurtenances attached to the Property";

(c)  All rights that Mortgagor has in the land which lies in the streets or roads in front of, or next to, the Property described in Schedule A;

(d)  All fixtures that are now or in the future will be on the Property described in Schedule A;

(e)  All of the rights and Property described in subparagraphs (a) through (d) of this section that Mortgagor acquires in the future; and

(f)  All replacements of or additions to the Property described in subparagraphs (a) through (e) of this section.

PARCEL-BLOCK-LOT # :  61.8-1-21.3

**MORTGAGOR'S RIGHT TO MORTGAGE THE PROPERTY AND MORTGAGOR'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY**
Mortgagor promises that: (a) Mortgagor owns the Property; (b) Mortgagor has the right to mortgage, grant and convey the Property to Lender; and (c) there are no outstanding claims or charges against the Property, except for those which are of public record, which are described in Schedule B.

Mortgagor gives a general warranty of title to Lender. This means that Mortgagor will be fully responsible for any losses which Lender suffers because someone other than Mortgagor has some of the rights in the Property which Mortgagor promises that Mortgagor has. Mortgagor promises that Mortgagor will defend Mortgagor's ownership of the Property against any claims of such rights.

**PLAIN LANGUAGE SECURITY INSTRUMENT**
This Security Instrument contains promises and agreements that are used in real property security instruments all over the country. It also contains other promises and agreements that vary, to a limited extent, in different parts of the country. Mortgagor's promises and agreements are stated in "plain language."

## COVENANTS

Mortgagor promises and agrees with Lender as follows:

**1.  BORROWER'S PROMISE TO PAY**
Borrower has promised to pay to Lender on time principal and interest due under the Obligations and any prepayment and late charges due under the Obligations.

**2.  PAYMENTS FOR TAXES AND INSURANCE**
Mortgagor will pay all amounts necessary to pay for taxes, assessments, water frontage charges and other similar charges, sewer rents, leasehold payments or ground rents (if any), hazard or property insurance covering the Property, and flood insurance (if any).

**3.  MORTGAGOR'S OBLIGATION TO PAY CHARGES, ASSESSMENTS AND CLAIMS**
Mortgagor will pay all taxes, assessments, water frontage charges and other similar charges, sewer rents, and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument. Mortgagor will also make payments due under Mortgagor's lease if Mortgagor is a tenant on the Property and Mortgagor will pay ground rents (if any) due on the Property. Mortgagor will do this either by making the payments to Lender that are described in Paragraph 2 above or, if Mortgagor is not required to make payments under Paragraph 2, by making the payments on time to the person owed them. (In this Security Instrument, the word "person" means any person, organization, governmental authority or other party.) If Mortgagor makes direct payments, then promptly after making any of those payments Mortgagor will give Lender a receipt which shows that Mortgagor has done so. If Mortgagor makes payment to Lender under Paragraph 2, Mortgagor will give Lender all notices or bills that Mortgagor receives for the amounts due under this Paragraph 3.

Mortgagor will promptly pay or satisfy all liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require Mortgagor to satisfy a superior lien if: (a) Mortgagor agrees, in writing, to pay the obligation which gave rise to the superior lien and Lender approves the way in which Mortgagor agrees to pay that obligation; or (b) in good faith, Mortgagor argues or defends against the superior lien in a lawsuit so that, during the lawsuit, the superior lien may not be enforced; or (c) Mortgagor secures from the holder of that other lien an agreement, approved in writing by Lender, that the lien of this Security Instrument is superior to the lien held by that person. If Lender determines that any part of the Property is subject to a superior lien, Lender may give Mortgagor a notice identifying the superior lien. Mortgagor shall pay or satisfy the superior lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**4.  MORTGAGOR'S OBLIGATION TO MAINTAIN HAZARD INSURANCE OR PROPERTY INSURANCE**
Mortgagor will obtain hazard or property insurance to cover all buildings and other improvements that now are or in the future will be located on the Property. The insurance must cover loss or damage caused by fire, hazards normally covered by "extended coverage" hazard insurance policies and other hazards for which Lender requires coverage, including floods and flooding. The insurance must be in the amounts and for the periods of time required by Lender. Mortgagor may choose the insurance company, but Mortgagor's choice is subject to Lender's approval. Lender may not refuse to approve Mortgagor's choice unless the refusal is reasonable. If Mortgagor does not maintain the insurance coverage described above, Lender may obtain insurance coverage to protect Lender's rights in the Property in accordance with Paragraph 6 below.

All of the insurance policies and renewals of those policies must include what is known as a "standard mortgage clause" to protect Lender. The form of all policies and renewals must be acceptable to Lender. Lender will have the right to hold the policies and renewals. If Lender requires, Mortgagor will promptly give Lender all receipts of paid premiums and renewal notices that Mortgagor receives.

If there is a loss or damage to the Property, Mortgagor will promptly notify the insurance company and Lender. If Mortgagor does not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company is called "proceeds." The proceeds will be used to repair or to restore the damaged Property unless: (a) it is not economically feasible to make the repairs or restoration; or (b) the use of the proceeds for that purpose would lessen the protection given to Lender by this Security Instrument; or (c) Lender and Mortgagor have agreed in writing not to use the proceeds for that purpose. If the repair or restoration is not economically feasible or if it would lessen Lender's protection under this Security Instrument, then the proceeds will be used to reduce the amount that Borrower and/or Mortgagor owes to Lender under the Obligations and then to the amount Mortgagor owes to Lender under this Security Instrument. If any of the proceeds remain after any amount that Mortgagor owes to Lender has been paid in full, the remaining proceeds will be paid to Mortgagor.

If Mortgagor abandons the Property, or if Mortgagor does not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may collect the proceeds. Lender may use the proceeds to repair or restore the Property or to pay the Sums Secured. The 30-day period will begin when the notice is given.

If any proceeds are used to reduce the amount of principal which Borrower and/or Mortgagor owes to Lender under the Obligations, that use will not delay the due date or change the amount of any of the payments under the Obligations and under Paragraphs 1 and 2 above.

If Lender acquires the Property under Paragraph 19 below, all of Mortgagor's rights in the insurance policies will belong to Lender. Also, all of Mortgagor's rights in any proceeds which are paid because of damage that occurred before the Property is acquired by Lender or sold will belong to Lender. However, Lender's rights in those proceeds will not be greater than the Sums Secured immediately before the Property is acquired by Lender or sold.

**5.  MORTGAGOR'S OBLIGATIONS TO MAINTAIN AND PROTECT THE PROPERTY, AND TO FULFILL ANY LEASE OBLIGATIONS; LOAN APPLICATION**

**(a)  Mortgagor's Obligations to Maintain and Protect the Property**
Mortgagor will keep the Property in good repair. Mortgagor will not destroy, damage or harm the Property, and Mortgagor will not allow the Property to deteriorate.

Mortgagor will be "in default" under this Security Instrument if Mortgagor fails to keep any promise or agreement made in this Security Instrument. Mortgagor also will be in default under this Security Instrument if any civil or criminal action or proceeding for "forfeiture" (that is, a legal action or proceeding to require the Property, or any part of the Property, to be given up) is begun and Lender determines, in good faith, that this action or proceeding could result in a court ruling (i) that would require forfeiture of the Property or (ii) that would materially impair the lien of this Security Instrument or Lender's rights in the Property. Mortgagor may correct the default by obtaining a court ruling that dismisses the legal action or proceeding, if Lender determines, in good faith, that this court ruling prevents forfeiture of Mortgagor's interests in the Property and also prevents any material impairment of (i) the lien created by this Security Instrument or (ii) Lender's rights in the Property. If Mortgagor corrects the default, Mortgagor will have the right to have enforcement of this Security Instrument discontinued, as provided in Paragraph 16 below, even if Lender has required immediate payment in full.

**(b) Mortgagor's Obligations to Fulfill Any Lease Obligations**
If Mortgagor does not own but is a tenant on the Property, Mortgagor will fulfill all Mortgagor's obligations under the lease. Mortgagor also agrees that, if Mortgagor acquires the fee title to the Property, Mortgagor's lease interest and the fee title will not merge unless Lender agrees to the merger in writing.

**(c) Loan Application**
If, during the application process for the Obligations, Borrower made false or inaccurate statements to Lender about information important to Lender in determining Borrower's eligibility for the loan, Lender will treat this action as a default under this Security Instrument. Also, if during the loan application process Borrower fails to provide Lender with information important to Lender in determining Borrower's and/or Mortgagor's eligibility for the loan, Lender will treat this as a default under this Security Instrument.

**6.   LENDER'S RIGHT TO PROTECT ITS RIGHTS IN THE PROPERTY**
If: (a) Mortgagor does not keep Mortgagor's promises and agreements made in this Security Instrument, or (b) someone, including Mortgagor, begins a legal proceeding that may significantly affect Lender's rights in the Property (such as a legal proceeding in bankruptcy, in probate, for condemnation or forfeiture, or to enforce laws or regulations), Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this Paragraph 6, Lender does not have to do so.

Mortgagor will pay to Lender any amounts, with interest, which Lender spends under this Paragraph 6. Mortgagor will pay those amounts to Lender when Lender sends Mortgagor a notice requesting that Mortgagor do so. Mortgagor will also pay interest on those amounts at the highest rate stated in the Obligations. Interest on each amount will begin on the date that the amount is spent by Lender. However, Lender and Mortgagor may agree in writing to terms of payment that are different from those in this paragraph. This Security Instrument will protect Lender in case Mortgagor does not keep this promise to pay those amounts with interest.

**7.   LENDER'S RIGHT TO INSPECT THE PROPERTY**
Lender, and others authorized by Lender, may enter on and inspect the Property. Lender must do so in a reasonable manner and at reasonable times. Before or at the time an inspection is made, Lender must give Mortgagor notice stating a reasonable purpose for the inspection.

**8.   AGREEMENTS ABOUT CONDEMNATION OF THE PROPERTY**
A taking of property by any governmental authority by eminent domain is known as "condemnation." Mortgagor gives to Lender Mortgagor's right: (a) to proceeds of all awards or claims for damages resulting from condemnation or other governmental taking of the Property; and (b) to proceeds from a sale of the Property that is made to avoid condemnation. All of those proceeds will be paid to Lender.

If all of the Property is taken, the proceeds will be used to reduce the Sums Secured. If any of the proceeds remain after the amount owed to Lender has been paid in full, the remaining proceeds will be paid to Mortgagor.

Unless Lender and Mortgagor agree otherwise in writing, if only a part of the Property is taken, and the fair market value of the Property immediately before the taking either is equal to, or greater than, the amount of the Sums Secured immediately before the taking, the amount owed to Lender will be reduced only by the amount of proceeds multiplied by a fraction. That fraction is as follows:  (a) the total amount of the Sums Secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. The remainder of the proceeds will be paid to Mortgagor.

Unless Lender and Mortgagor agree otherwise in writing or unless the law requires otherwise, if only a part of the Property is taken, and the fair market value of the Property immediately before the taking is less than the amount of the Sums Secured immediately before the taking, the proceeds will be used to reduce the Sums Secured.

If Mortgagor abandons the Property, or if Mortgagor does not answer, within 30 days, a notice from Lender stating that a governmental authority has offered to make a payment or to settle a claim for damages, Lender has the authority to collect the proceeds. Lender may then use the proceeds to repair or restore the Property or to reduce the Sums Secured. The 30-day period will begin when the notice is given.

If any proceeds are used to reduce the amount of principal owed to Lender under the Obligations, that use will not delay the due date or change the amount of any of the payments under the Obligations and under Paragraphs 1 and 2 above.

**9.   CONTINUATION OF BORROWER'S AND MORTGAGOR'S OBLIGATIONS AND OF LENDER'S RIGHTS**
**(a) Borrower's Obligations**
Lender may allow a person who takes over Borrower's rights and obligations to delay or to change the amount of the payments of principal and interest due under the Obligations or under this Security Instrument. Even if Lender does this, however, that person and Borrower will both still be fully obligated under the Obligations and Mortgagor will still be fully obligated under this Security Instrument.

Lender may allow those delays or changes for a person who takes over Borrower's rights and obligations, even if Lender is requested not to do so. Lender will not be required to bring a lawsuit against such a person for not fulfilling obligations under the Obligations or under this Security Instrument, even if Lender is requested to do so.

**(b) Lender's Rights**
Even if Lender does not exercise or enforce any right of Lender under this Security Instrument or under the law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if Lender obtains insurance, pays taxes, or pays other claims, charges or liens against the Property, Lender will have the right under Paragraph 19 below to demand that Mortgagor make immediate payment in full of the amount that Mortgagor owes to Lender under this Security Instrument.

**10. OBLIGATIONS OF MORTGAGOR AND OF PERSONS TAKING OVER MORTGAGOR'S RIGHTS OR OBLIGATIONS**
Any person who takes over Mortgagor's rights or obligations under this Security Instrument will have all of Mortgagor's rights and will be obligated to keep all of Mortgagor's promises and agreements made in this Security Instrument. Similarly, any person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's agreements made in this Security Instrument.

If more than one person signs this Security Instrument as Mortgagor, each Mortgagor is fully obligated to keep all of Mortgagor's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each Mortgagor individually or against all Mortgagors together. This means that any one Mortgagor may be required to pay all of the Sums Secured.

**11. LOAN CHARGES**
If an Obligation secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Obligation exceed permitted limits:  (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Obligations or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Obligations.

**12. NOTICES REQUIRED UNDER THIS SECURITY INSTRUMENT**
Any notice that must be given to Mortgagor under this Security Instrument will be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice will be addressed to Mortgagor at the address stated in Schedule A.  A notice will be given to me at a different address if Mortgagor gives Lender a notice of Mortgagor's different address. Any notice that must be given to Lender under this Security Instrument will be given by mailing it to Lender's address stated in this Mortgage. A notice will be mailed to Lender at a different address if Lender gives Mortgagor a notice of the different address. A notice required by this Security Instrument is given when it is mailed or when it is delivered according to the requirements of this Paragraph 12 or of applicable law.

**13. LAW THAT GOVERNS THIS SECURITY INSTRUMENT**
This Security Instrument is governed by federal law and the law that applies in the place where the Property is located. If any term of this Security Instrument or of any Obligation conflicts with the law, all other terms of this Security Instrument and of the Obligation will still remain in effect if they can be given effect without the conflicting term. This means that any terms of this Security Instrument and of the Obligations which conflict with the law can be separated from the remaining terms, and the remaining terms will still be enforced.

**14. MORTGAGOR'S COPY**
Mortgagor will be given one conformed copy of this Security Instrument.

**15. AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED**
Lender may require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. Lender also may require immediate payment in full if a beneficial interest in Mortgagor is sold or transferred and Mortgagor is not a natural person. However, Lender shall not require immediate payment in full if this is prohibited by federal law on the date of this Security Instrument.

**16. MORTGAGOR'S RIGHT TO HAVE LENDER'S ENFORCEMENT OF THIS SECURITY INSTRUMENT DISCONTINUED**
Even if Lender has required immediate payment in full, Mortgagor may have the right to have enforcement of this Security Instrument discontinued. Mortgagor will have this right at any time before sale of the Property under any power of sale granted by this Security Instrument or at any time before a judgment has been entered enforcing this Security Instrument if Mortgagor meets the following conditions:

(a)  Mortgagor pays to Lender the full amount that then would be due under this Security Instrument and Borrower pays to Lender the full amount owed under the Obligations as if immediate payment in full had never been required; and

(b)  Mortgagor corrects Mortgagor's failure to keep any of Mortgagor's other promises or agreements made in this Security Instrument; and

(c)  Mortgagor pays all of Lender's reasonable expenses in enforcing this Security Instrument including, for example, reasonable attorneys' fees to the extent permitted by law; and

(d)  Mortgagor does whatever Lender reasonably requires to assure that Lender's rights in the Property, Lender's rights under this Security Instrument, and Mortgagor's obligations under this Security Instrument continue unchanged.

If Mortgagor fulfills all of the conditions in this Paragraph 16, then the Obligations and this Security Instrument will remain in full effect as if immediate payment in full had never been required. However, Mortgagor will not have the right to have Lender's enforcement of this Security Instrument discontinued if Lender has required immediate payment in full under Paragraph 15 above.

**17. HOLDER'S RIGHT TO SELL THE NOTES OR AGREEMENTS OR AN INTEREST IN THE NOTES OR AGREEMENTS**
The promissory note(s) or agreement(s) evidencing the Obligations, or an interest in such notes or agreements, together with this Security Instrument, may be sold one or more times. Mortgagor may not receive any prior notice of these sales.

**18. CONTINUATION OF MORTGAGOR'S OBLIGATIONS TO MAINTAIN AND PROTECT THE PROPERTY**
The federal laws and the laws of the jurisdiction where the Property is located that relate to health, safety, or environmental protection are called "Environmental Laws." Mortgagor will not do anything affecting the Property that violates Environmental Laws, and Mortgagor will not allow anyone else to do so.

Environmental Laws classify certain substances as toxic or hazardous. There are other substances that are considered hazardous for purposes of this Paragraph 18. These are gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. The substances defined as toxic or hazardous by Environmental Laws and the substances considered hazardous for purposes of this Paragraph 18 are called "Hazardous Substances."

Mortgagor will not permit Hazardous Substances to be present on the Property. Mortgagor will not use or store Hazardous Substances on the Property, and Mortgagor will not allow anyone else to do so. Mortgagor also will not dispose of Hazardous Substances on the Property, or release any Hazardous Substance on the Property, and Mortgagor will not allow anyone else to do so. However, Mortgagor may permit the presence on the Property of small quantities of Hazardous Substances that are generally recognized as appropriate for normal residential use and maintenance of the Property, and Mortgagor may use or store these small quantities on the Property. In addition, unless the law requires removal or other action, the buildings, the improvements and the fixtures on the Property are permitted to contain asbestos and asbestos-containing materials if the asbestos and asbestos-containing materials are undisturbed and "non-friable" (that is, not easily crumbled by hand pressure).

If Mortgagor knows of any investigation, claim, demand, lawsuit or other action by the government or by a private party involving the Property and any Hazardous Substance or Environmental Laws, Mortgagor will promptly notify the Lender in writing. If the government notifies Mortgagor (or Mortgagor otherwise learns) that it is necessary to remove a Hazardous Substance affecting the Property or to take other remedial actions, Mortgagor will promptly take all necessary remedial actions as required by Environmental Laws.

**19. LENDER'S RIGHTS IF BORROWER OR MORTGAGOR FAILS TO KEEP PROMISES AND AGREEMENTS**
If Borrower or Mortgagor fails to keep promises and agreements and except as provided in Paragraph 15 above, Lender may require that Borrower pay immediately the entire amount then remaining unpaid under the Obligations and Mortgagor pay immediately the entire amount due under this Security Instrument. Lender may do this without making any further demand for payment. This requirement is called "immediate payment in full."

If Lender requires immediate payment in full, Lender may bring a lawsuit to take away all of Mortgagor's remaining rights in the Property and have the Property sold. At this sale Lender or another person may acquire the Property. This is known as "foreclosure and sale." In any lawsuit for foreclosure and sale, Lender will have the right to collect all costs and disbursements and additional allowances allowed by law and will have the right to add all reasonable attorneys' fees to the amount Mortgagor owes Lender, which fees shall become part of the Sums Secured.

**20. LENDER'S OBLIGATION TO DISCHARGE THIS SECURITY INSTRUMENT**
When Lender has been paid all amounts due under the promissory notes or agreements evidencing the Obligations and under this Security Instrument, Lender will discharge this Security Instrument by delivering a certificate stating that this Security Instrument has been satisfied. Mortgagor will not be required to pay Lender for the discharge, but Mortgagor will pay all costs of recording the discharge in the proper official records.

**21. AGREEMENTS ABOUT NEW YORK LIEN LAW**
Borrower will receive all amounts lent to Borrower by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law. This means that if, on the date this Security Instrument is recorded, construction or other work on any building or other improvement located on the Property has not been completed for at least four months, Borrower will: (a) hold all amounts received, and which Borrower has a right to receive from Lender under the Obligations as a "trust fund"; and (b) use those amounts to pay for that construction or work before Borrower uses them for any other purpose. The fact that Borrower is holding those amounts as a "trust fund" means that for any building or other improvement located on the Property, Borrower has a special responsibility under the law to use the amount in the manner described in this Paragraph 21.

**22. ASSIGNMENT OF RENTS**
Mortgagor absolutely and unconditionally assigns and transfers to Lender all of the rents and revenues ("Rents") of the Property, regardless to whom the Rents of the Property are payable. Mortgagor authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Mortgagor shall receive the Rents until (i) Lender has given Mortgagor a notice of default pursuant to this Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

**23. ADDITIONAL TERMS:**

Mortgagor acknowledges that Mortgagor has read, understands, and agrees to the terms and conditions of this Mortgage, and acknowledges receipt of an exact copy of same.

Dated this _____31_____ day of ___March 2009___

MORTGAGOR _____    MORTGAGOR _____
LARRY B. WEINSTEIN                          LINDA WEINSTEIN

MORTGAGOR _____    MORTGAGOR _____

MORTGAGOR _____    MORTGAGOR _____

MORTGAGOR _____    MORTGAGOR _____


STATE OF NEW YORK                )
                                 ) ss.:
COUNTY OF _____           )

On the ___31___ day of ___March___ in the year ___2009___ before me, the undersigned, personally appeared _____Linda & Larry Weinstein_____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person on behalf of which the individual(s) acted, executed the instrument.

CORINNE WOLFER
Notary Public, State of New York
No. 01WO6091039
Qualified in Rockland County
Commission Expires April 21, 20__    _____ Notary Public

---

### SCHEDULE A

The following described real property located in the County of ___ROCKLAND___, State of ___NEW YORK___:

SEE ATTACHED EXHIBIT A

COLLATERAL ADDRESS:    7 STILLIO DR    AIRMONT, NY    10952

---

### SCHEDULE B

BORROWER AND LENDER REQUEST THE HOLDER OF ANY MORTGAGE, DEED OF TRUST OR OTHER ENCUMBRANCE WITH A LIEN WHICH HAS PRIORITY OVER THIS MORTGAGE TO GIVE NOTICE TO LENDER, AT LENDER'S ADDRESS SET FORTH ON PAGE ONE OF THIS MORTGAGE, OF ANY DEFAULT UNDER THE SUPERIOR ENCUMBRANCE AND OF ANY SALE OR OTHER FORECLOSURE ACTION.

---

WHEN RECORDED, RETURN TO:
EQUITY LOAN SERVICES, INC.
1100 SUPERIOR AVENUE, SUITE 200
CLEVELAND, OHIO 44114
NATIONAL RECORDING - TEAM 1
Accommodation Recording Per Client Request

**THIS INSTRUMENT WAS PREPARED BY:**
KeyBank National Association
David G. Fisher

EXHIBIT A


ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, WITH THE
BUILDINGS AND IMPROVEMENTS THEREON ERECTED, SITUATE, LYING
AND BEING IN THE VILLAGE OF AIRMONT, TOWN OF RAMAPO, COUNTY
OF ROCKLAND AND STATE OF NEW YORK, SHOWN AND DESIGNATED AS
LOT 3 ON A CERTAIN MAP ENTITLE "FINAL SUBDIVISION PLAT, SHERI
ESTATES, VILLAGE OF AIRMONT, TOWN OF RAMAPO, ROCKLAND COUNTY,
NEW YORK", DATED AUGUST 18, 1997 AND LAST REVISED ON 7/6/99
MADE BY ATZL, SCATASSA & ZIGLER, P.C. AND FILED IN THE
ROCKLAND COUNTY CLERK'S OFFICE ON AUGUST 23RD, 1999 IN MAP
BOOK 120 PAGE 28 AS MAP #7296 AND BEING MORE PARTICULARY
BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE WESTERLY SIDE OF STILLO DRIVE,
SAID POINT BEING THE SOUTHEASTERLY CORNER OF THE PREMISES,
BEING THE NORTHEASTERLY CORNER OF LOT 2 ON THE AFORESAID
FILED MAP AND SAID POINT BEING DISTANT NORTHERLY (AS MEASURED
ALONG THE WESTERLY SIDE OF STILLO DRIVE) 546.61 FEET FROM THE
CORNER FORMED BY THE INTERSECTION OF THE NORTHERLY SIDE OF
SMITH HILL ROAD WITH THE WESTERLY SIDE OF STILLO DRIVE AND
RUNNING THENCE;

1. NORTH 68°37'19" WEST ALONG THE SOUTHERLY LINE OF THE
PREMISES AND THE NORTHERLY LINE OF SAID LOT 2 ON THE
AFORESAID FILED MAP 224.48 FEET TO THE POINT IN A STONE WALL
IN THE EASTERLY LINE OF LANDS NOW OR FORMERLY OF NANCY YETMAN
(TAX LOT 20-5C), BEING THE NORTHWESTERLY CORNER OF SAID LOT 2
AND BEING THE SOUTHWESTERLY CORNER OF THE PREMISES, THENCE;

2. NORTH 21°22'41" EAST ALONG THE WESTERLY LINE OF THE
PREMISES AND THE EASTERLY LINE OF SAID LANDS NOW OR FORMERLY
OF NANCY YETMAN 193.00 FEET, THE MAJORITY OF SAID DISTANCE
THROUGH THE AFORESAID STONE WALL, TO THE SOUTHWESTERLY CORNER
OF LOT 4 ON THE AFORESAID FILED MAP AND BEING THE
NORTHWESTERLY CORNER OF THE PREMISES, THENCE;

3. SOUTH 68°37'19" EAST ALONG THE NORTHERLY LINE OF THE
PREMISES AND THE SOUTHERLY LINE OF SAID LOT 4 ON THE
AFORESAID FILED MAP 208.50 FEET TO A POINT IN THE WESTERLY
SIDE OF STILLO DRIVE, BEING THE SOUTHEASTERLY CORNER OF SAID
LOT 4 AND BEING THE NORTHEASTERLY CORNER OF THE PREMISES,
THENCE;

4. SOUTHWESTERLY ALONG THE WESTERLY SIDE OF STILLO DRIVE THE
FOLLOWING TWO (2) COURSES AND DISTANCES:

A) SOUTH 16°30'40" WEST 83.47 FEET TO A POINT, THENCE;

B) SOUTH 16°45'00" WEST 110.20 FEET TO THE NORTHEREASTERRLY
CORNER OF LOT 2 ON THE AFORESAID FILED MAP, BEING THE
SOUTHEASTERLY CORNER OF THE PREMISES AND THE POINT OR PLACE
OF BEGINNING.

RESERVING THE FEE SIMPLE ESTATE TO THE LANDS LYING IN THE BED
AND/OR RIGHT-OF-WAY OF STILLO COURT UNTO K.D.J. REALTY, INC.,
ITS HEIRS, SUCCESSORS AND ASSIGNS, FOR PURPOSES OF DEDICATING
SAME TO THE VILLAGE OF AIRMONT AND/OR TOWN OF RAMAPO AS WELL
AS THE RESERVATION OF THE RIGHT TO DEDICATE THE EASEMENTS
SHOWN ON FILED MAP #7296 WHICH CROSS/AFFECT THE PREMISES
HEREINABOVE DESCRIBED TO THE VILLAGE OF AIRMONT AND/OR TOWN
OF RAMAPO; BUT, TOGETHER WITH AN EASEMENT FOR INGRESS, EGRESS
AND ALL UTILITY PURPOSES OVER STILLO DRIVE SOUTHERLY TO SMITH
HILL ROAD, THE NEAREST PUBLIC HIGHWAY.


LARRY B. WEINSTEIN A/K/A LARRY WEINSTEIN AND LINDA R. WEINSTEIN
A/K/A LINDA WEINSTEIN, HUSBAND AND WIFE

7 STILLO DRIVE, AIRMONT NY 10952-4149
Loan Reference Number  :
First American Order No: ████████████



**AFFIDAVIT REQUESTING EXEMPTION
UNDER SECTION 255 OF THE TAX LAW**

**FILED**

APR 2 1 2009

**ROCKLAND COUNTY
CLERK'S OFFICE**

STATE OF: Ohio

COUNTY OF: Stark

Jacqueline Smallridge, Assistant Vice President, being duly sworn, disposes and says:

1. That she resides in <u>Canton, Ohio</u>.

2. That a supplement instrument, namely an original mortgage deed, dated <u>11/30/07</u>, between Larry B Weinstein and Linda Weinstein and KeyBank National Association are about to be recorded in the Rockland County Clerk's Office to correct the legal description;

3. That the following mortgage has previously been recorded affecting the same indebtedness referred to in such supplemental instrument: A Home Equity Line of Credit Account Mortgage dated 11/30/07. Made to Larry B Weinstein and Linda Weinstein by KeyBank National Association in the maximum principal amount of $ 250,000.00, recorded in the Rockland County Clerk's Office in Instrument# 2007-00063013, upon which a mortgage tax of $3,220.00 was paid to the <u>Rockland</u> County Clerk.

4. That the maximum principal amount secured or to be secured by the Home Equity Line of Credit Account Mortgage as re-recorded will be $ 250,000.00.

*Jacqueline Smallridge*
Jacqueline Smallridge, Assistant Vice President

Subscribed and sworn to before me this
27th day of March 2009.

*Pamela S Conrad*
Notary Public

PAMELA S. CONRAD
Notary Public, State of Ohio
My Commission Expires
April 18, 2010

*s: useruser\clientse\subordin\affidavit 255*

**UNIFORM FORM CERTIFICATE OF ACKNOWLEDGMENT**
**(OUTSIDE STATE OF NEW YORK)**

State of: Ohio

County of: Stark ) ss:

On the 27th day of March in the year 2009 before me, the undersigned, personally appeared Jacqueline Smallridge, Assistant Vice President, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is(are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument, and that such individual(s) made such appearance before the undersigned in the City of Canton, Ohio. (Insert the city or other political subdivision and the state or country or other place the acknowledgment was taken.)

Notary Public

My commission expires:

PAMELA S. CONRAD
Notary Public, State of Ohio
My Commission Expires
April 18, 2010

When recorded mail to:

**KeyBank National Association**
**P.O. Box 6899**
**Cleveland, OH 44101**

EXHIBIT "B"

19-23827-rdd    Doc 102-1    Filed 05/12/21    Entered 05/12/21 16:36:50    Exhibits
Pg 30 of 42

:    :

,

.

**Paul Piperato, County Clerk**
1 South Main St Ste 100
New City, NY  10956
(845) 638-5221

# Rockland County Clerk Recording Cover Sheet

**Received From :**
FIRST AMERICAN TITLE INSURANCE  CO
1100 SUPERIOR AVE SUITE 200
CLEVELAND, OH  44114

**Return To :**
FIRST AMERICAN TITLE INSURANCE  CO
1100 SUPERIOR AVE SUITE 200
CLEVELAND, OH  44114

**First GRANTOR**

WEINSTEIN, LARRY  -AKA

**First GRANTEE**

KEYBANK NA

**Index Type :** Land Records

**Instr Number :** 2009-00014481          **Orig Instr #:** 2009-00012831

**Book :**              **Page :**

**Type of Instrument :** Mtg &  Consl
**Type of Transaction :** Mtg And Consl

**Recording Fee :**          $75.00

**Recording Pages :**            7

The Property affected by this instrument is situated in Ramapo, in the
County of Rockland, New York

### Mortgage Taxes

| | |
|---|---|
| **Property Located :** | Ramapo |
| **Serial Number :** | DA757 |
| **Mortgage Amount :** | $200,000.00 |

| | |
|---|---|
| **Basic Tax :** | $1,000.00 |
| **Local Tax :** | $0.00 |
| **Additional Tax :** | $600.00 |
| **Transportation Auth Tax :** | $500.00 |
| **SONYMA :** | $0.00 |
| **County Tax :** | $500.00 |
| **Total :** | $2,600.00 |
| **Total Fees :** | $2,675.00 |

State of New York

County of Rockland

I hereby certify that the within and foregoing was
recorded in the Clerk's office for Rockland County,
New York

On (Recorded Date) : 05/04/2009

At (Recorded Time) :  9:20:20 AM

Doc ID - 019116420007

Paul Piperato, County Clerk

This sheet constitutes the Clerks endorsement required by Section 319 of Real Property Law of the State of New York

Entered By: HAH  Printed On : 05/05/2009   At :  9:22:54AM

# MODIFICATION AND EXTENSION
# OF PROMISSORY NOTE/MORTGAGE

| BORROWER | MORTGAGOR |
|---|---|
| **LARRY WEINSTEIN**<br>**LINDA WEINSTEIN** | **LARRY WEINSTEIN, MARRIED**<br>**HTTA LARRY B. WEINSTEIN**<br>**LINDA WEINSTEIN, MARRIED**<br>**HTTA LINDA R. WEINSTEIN** |
| **ADDRESS** | **ADDRESS** |
| 7 STILLO DR<br>AIRMONT, NY 10952<br>TELEPHONE NO.        IDENTIFICATION NO. | 7 STILLO DR<br>AIRMONT, NY 10952<br>TELEPHONE NO.        IDENTIFICATION NO. |

**ADDRESS OF REAL PROPERTY:**
7 STILLO DR
AIRMONT, NY 10952

THIS MODIFICATION AND EXTENSION OF PROMISSORY NOTE/MORTGAGE, dated the _31st_ day of __March 2009__ ,
is executed by and between the parties identified above and __KeyBank National Association__

__4910 Tiedeman Road, Suite C, Brooklyn, OH 44144__ ("Lender").
A. On __November 26, 2007__ , Lender made a loan ("Loan") to Borrower evidenced by Borrower's promissory note or
agreement ("Note") payable to Lender in the original principal amount of __two hundred fifty thousand and__
__00/100__ Dollars ($ _250,000.00_ ),
which Note is secured by a mortgage ("Mortgage") dated __November 26, 2007__ , executed by Mortgagor for the benefit of
Lender and encumbering the real property described on Schedule A ("Property"), and recorded on __December 10, 2007__
in Liber_____ at Page_____ or as Instrument Number _2009-000/2831_ in the Office of
the Clerk of __ROCKLAND__ County, New York. The Note and Mortgage and any other related documents
are hereafter cumulatively referred to as the "Loan Documents".

B. The Note and Mortgage are hereby modified as follows:

   1. TERMS OF REPAYMENT.
   [ ] The maturity date of the Note is extended to _____ , at which time all outstanding
sums due to Lender under the Note shall be paid in full, and the Mortgage is modified accordingly. The parties acknowledge and agree that, as
of _____ , the unpaid principal balance due under the Note was $_____
and the accrued and unpaid interest on that date was $_____ . The new repayment terms are as follows:




   2. ADDITIONAL MODIFICATIONS.
   [x] The Note and Mortgage are further modified as follows:
   The original amount of the Note, which is secured by the Mortgage
   referenced above, and the original principal amount of such Mortgage in
   the amount of two hundred fifty thousand and 00/100 dollars ($250,000.00)
   is hereby increased to four hundred fifty thousand and 00/100 dollars
   ($450,000.00), an increase of two hundred  thousand and 00/100 dollars
   ($200,000.00).

C. Additional Representations, Warranties and Agreements.
   Mortgagor represents and warrants that Mortgagor owns the property free and clear of any liens or encumbrances other than the liens
described on Schedule B below. Except as expressly modified herein, all terms and conditions of the Loan Documents shall remain in full force
and effect. The parties hereby adopt, ratify and confirm these terms and conditions as modified. Borrower and Mortgagor agree to execute any
additional documents which may be required by Lender to carry out the intention of this Agreement. As of the date of this Agreement, there are
no claims, defenses, setoffs or counterclaims of any nature which may be asserted against Lender by any of the undersigned.

PARCEL-BLOCK-LOT #:  61.8-1-213

LPNY582 ® Harland Financial Solutions Inc. (08/18/02) (800) 937-3799                    Page 1 of 4 _____

CNSL
R
541

## SCHEDULE A

The following described real property located in the County of ROCKLAND_____, State of _New York_____

SEE ATTACHED EXHIBIT ''A''

THIS PROPERTY WILL BE
IMPROVED BY A 1 OR 2 FAMILY
DWELLING ONLY

COLLATERAL ADDRESS: 7 STILLO DR AIRMONT, NY 10952

## SCHEDULE B

BORROWER AND LENDER REQUEST THE HOLDER OF ANY MORTGAGE, DEED OF TRUST OR
OTHER ENCUMBRANCE WITH A LIEN WHICH HAS PRIORITY OVER THIS MORTGAGE TO GIVE
NOTICE TO LENDER, AT LENDER'S ADDRESS SET FORTH ON PAGE ONE OF THIS
MORTGAGE, OF ANY DEFAULT UNDER THE SUPERIOR ENCUMBRANCE AND OF ANY SALE OR
OTHER FORECLOSURE ACTION.

MORTGAGOR:

**LARRY WEINSTEIN**

MORTGAGOR:

_HTTA_ **HTTA LARRY B. WEINSTEIN**

MORTGAGOR:

**LINDA WEINSTEIN**

MORTGAGOR:

_HTTA_ **HTTA LINDA R. WEINSTEIN**

MORTGAGOR:

MORTGAGOR:

MORTGAGOR:

BORROWER:

**LARRY WEINSTEIN**

BORROWER:

**LINDA WEINSTEIN**

BORROWER:

_____

BORROWER:

_____

BORROWER:

_____

BORROWER:

_____

BORROWER:

_____

BORROWER:

_____

LENDER:

KeyBank National Association    *Eileen M Schmid*
                                EILEEN M SCHMID
                                COLLATERAL ADMINISTRATOR

_____ *WEINSTEIN H77A LARRY B WEINSTEIN*

STATE OF NEW YORK
COUNTY OF *Rockland*                    ) SS.:
                                        )
On the *31* day of *March* in the year *2009* before me, the undersigned, personally appeared
*Larry Weinstein Linda Weinstein H77A Linda R Weinstein*
personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the
within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their
signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

CORINNE WOLKEN
Notary Public, State of New York
No. 01WO6091039                         _____
Qualified in Rockland County            Notary Public
Commission Expires April 21, 20 11

STATE OF NEW YORK
COUNTY OF _____               ) SS.:
                                        )
On the _____ day of _____ in the year _____ before me, the undersigned, personally appeared
_____
personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the
within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their
signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

STATE OF ~~NEW YORK~~ *OHIO*
COUNTY OF *Cuyahoga*                     ) SS.:
                                         )
On the *6* day of *April* in the year *2009* before me, the undersigned, personally appeared
*Eileen M Schmid*
personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the
within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their
signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

*Beverly Reid*
Notary Public

BEVERLY REID
Notary Public, State of Ohio
My Commission Expires
May 17, 2010

ACAPS #: ████████

**THIS INSTRUMENT WAS PREPARED BY:**

KeyBank National Association
David G. Fisher

**AFTER RECORDATION RETURN TO:**

KeyBank National Association
P.O. Box 6899
Cleveland, OH 44101
(845) 634-4928

EXHIBIT A
WEINSTEIN, 

ALL THAT PARCEL OF LAND IN THE VILLAGE OF AIRMONT, TOWN OF RAMAPO, ROCKLAND
COUNTY, STATE OF NEW YORK, AS MORE FULLY DESCRIBED IN DEED INST # 199900066416, ID#
61.8-1-21.3, BEING KNOWN AND DESIGNATED AS ALL THAT CERTAIN PLOT, PIECE OR PARCEL
OF LAND, WITH THE BUILDINGS AND IMPROVEMENTS THEREON ERECTED, SITUATE, LYING
AND BEING IN THE VILLAGE OF AIRMONT, TOWN OF RAMAPO, COUNTY OF ROCKLAND AND
STATE OF NEW YORK, SHOWN AND DESIGNATED AS LOT 3 ON A CERTAIN MAP ENTITLES,
"FINAL SUBDIVISION PLAT, SHERI ESTATES, VILLAGE OF AIRMONT, TOWN OF RAMAPO,
ROCKLAND COUNTY, NEW YORK" DATED AUGUST 18, 1997 AND LAST REVISED ON 7/6/99 MADE
BY ATZL, SCATASSA & ZIGLER, P.C. AND FILED IN THE ROCKLAND COUNTY CLERK'S OFFICE ON
AUGUST 23RD, 1999 IN MAP BOOK 120 PAGE 28 AS MAP #7296 AND BEING ORE PARTICULARLY
BOUNDED AND DESCRIBED AS FOLLOWS:
BEGINNING AT A POINT ON THE WESTERLY SIDE OF STILLO DRIVE, SAID POINT BEING THE
SOUTHEASTERLY CORNER OF THE PERMISES, BEING THE NORTHEASTERLY CORNER OF LOT
2 ON THE AFORESAID FILED MPA AND SAID POINT BEING DISTANT NORTHERLY (AS MEASURED
ALONG THE WESTERLY SIDE OF STILLO DRIVE) 546.61 FEET FROM THE CORNER FORMED BY
THE INTERSECTION OF THE NORTHERLY SIDE OF SMITH HILL ROAD WITH THE WESTERLY
SIDE OF STILLO DRIVE AND RUNNING THENCE:
1. NORTH 68 DEGREES 37' 19" WEST ALONG THE SOUTHERLY LINE OF THE PREMISES AND THE
NORTERLY LINE OF SAID LOT 2 ON THE AFORESAID FILED MAP 224.48 FEET TO A POINT IN A
STONE WALL IN THE EASTERLY LINE OF LANDS NOW OR FORMERLY OF NANCY YETMAN (TAX
LOT 20-5C), BEING THE NORTHWESTERLY CORNER OF SAID LOT 2 AND BEING THE
SOUTHWESTERLY CORNER OF THE PREMISES, THENCE;
2. NORTH 21 DEGREES 22' 41" EAST ALONG THE WESTERLY LINE OF THE PREMISES AND THE
EASTERLY LINE OF SAID LANDS NOW OR FORMERLY OF NANCY YETMAN 193.00 FEET, THE
MAJORITY OF SAID DISTANCE THROUGH THE AFORESAID STONE WALL, TO THE
SOUTHWESTERLY CORNER OF THE PREMISES, THENCE;
3. SOUTH 68 DEGREES 37' 19" EAST ALONG THE NORTHERLY LINE OF THE PREMISES AND THE
SOUTHERLY LINE OF SAID LOT 4 ON THE AFORESAID FILED MAP 208.50 FEET TO A POINT IN
THE WESTERLY SIDE OF STILLO DRIVE, BEING THE SOUTHEASTERLY CORNER OF SAID LOT 4
AND BEING THE NORTHEASTERLY CORNER OF THE PREMISES. THENCE;
4. SOUTHWESTERLY ALONG THE WESTERLY SIDE OF STILLO DRIVE THE FOLLOWING TWO (2)
COURSES AND DISTANCES:
A). SOUTH 16 DEGREES 30' 40" WEST 83.47 FEET TO A POINT, THENCE;
B). SOUTH 16 DGREES 45' 00" WEST 110.20 FEET TO THE NORTHEASTERLY CORNER OF LOT 2
ON THE AFORESAID FILED MAP, BEING THE SOUTHEASTERLY CORNER OF THE PREMISES AND
THE POINT OR PLACE OF BEGINNING. RESERVING THE FEE SIMPLE ESTATE TO THE LANDS
LYING IN THE BED AND/OR RIGHT-OF-WAY OF STILLO COURT UNTO K/D/J/ REALTY, INC., ITS
HEIRS, SUCCESSORS AND ASSIGNS, FOR PURPOSES OF DEDICATING SAME TO THE VILLAGE
OF AIRMONT AND/OR TOWN OF RAMAPO AS WELL AS THE RESERVATION OF THE RIGHT TO
DEDICATE THE EASEMENTS SHOWN ON FILED MAP #7296 WHICH CROSS/AFFECT THE
PREMISES HEREINABOVE DESCRIBED TO THE VILLAGE OF AIRMONT AND/OR TOWN OF
RAMAPO; BUT TOGETHER WITH AN EASEMENT FOR INGRESS, EGRESS AND ALL UTILITY
PURPOSES OVER STILLO DRIVE SOUTHERLY TO SMITH HILL ROAD, THE NEAREST PUBLIC
HIGHWAY.

WEINSTEIN        NY

FIRST AMERICAN ELS
MODIFICATION AGREEMENT

**AFFIDAVIT REQUESTING TAX EXEMPTION**
**UNDER NEW YORK TAX LAW 255**

STATE OF NEW YORK      )
                         )
COUNTY OF _Rockland_   )

_Vanda Murray_____, being duly sworn, deposes and says:

1. That He/She is an Officer of KeyBank National Association.
_New City Office_

2. That He/She resides at: _3 Cavalry Dr. New City NY 10956_:

3. That a certain Home Equity Line of Credit Mortgage dated the _26th_ day of
_November_ , _2007_ was granted by:

LARRY WEINSTEIN _____    LINDA WEINSTEIN_____

HTTA LARRY B. WEINSTEIN _____    HTTA LINDA R. WEINSTEIN_____

to _KeyBank National Association_ securing a maximum amount of principal indebtedness of

$ _250,000.00_ and recorded in the _ROCKLAND_____ County Clerk's Office on the

_10th_ day of _December_ , _2007_ , in Liber _____ of Mortgages, Page _____, and/or

Instrument # _2007-00063013_____ , at which time a mortgage tax of $ _3,220.00_____ was

paid thereon and that no re-loans or readvances have become secured thereby except as expressly

permitted by Article 11 of the New York Tax Law.

4. That supplemental instrument, namely a Modification and Extension Agreement modifying the
Mortgage and the Note, dated _March 31_ , _2009_ , between:

LARRY WEINSTEIN _____    LINDA WEINSTEIN_____

HTTA LARRY B. WEINSTEIN _____    HTTA LINDA R. WEINSTEIN_____

and KeyBank National Association is about to be recorded in the _ROCKLAND_____ County
Clerk's Office.

5. That the Modification and Extension Agreement increases the maximum principal amount secured or to
be secured by the Home Equity Line of Credit Account Mortgage referred to above from
$ _250,000.00_____ to $ _450,000.00_____ , an increase of $ _200,000.00_____ upon
which a mortgage tax of $ _2,570.00_____ will be paid.

6. That the maximum principal amount secured or to be secured by the Home Equity Line of Credit
Account Mortgage as modified by the Modification and Extension Agreement will be
$ _450,000.00_____ .

7. The deponent respectfully requests that the Modification and Extension Agreement be declared exempt
from taxation pursuant to the provisions of New York Tax Law Section 255 except to the extent of the
tax imposed as provided in Section 253 of the New York Tax Law on the increase of
$ _200,000.00_____ .

8. The balance of principal indebtedness outstanding under the previously recorded mortgage which is
being modified at the date of execution of the supplemental instrument is
$ _250,000.00_____ .

_Vanda Murray_
OFFICER

Subscribed and sworn to before me
this _31_ day of _March_ , 20 _09_.

_Corinne Wolper_
Notary Public

CORINNE WOLPER
Notary Public, State of New York
No. 01WO6091039
Qualified in Rockland County
Commission Expires April 21, 20_11_

NY_LOC Increase Tax Affidavit for KeyBank 01/04
v1}

EXHIBIT "C"

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

Larry B. Weinstein
   d/b/a LBW Real Estate Holdings, LLC
   d/b/a Key Construction, LLC
   d/b/a Slinn Avenue, LLC
   d/b/a Post Office Square, LLC
   d/b/a Bernadette properties, LLC
   d/b/a Chad Estates, LLC.,

                                   Chapter 11
                                   Case No. 19-23827-rdd

       Debtor.

---------------------------------------------------------x

---

## RELIEF FROM STAY - REAL ESTATE AND COOPERATIVE APARTMENTS

I, *Rhianna Ford*, a *Sr. Specialist*
with KeyBank National Association, hereby declare:

### BACKGROUND INFORMATION

1. REAL PROPERTY OR COOPERATIVE APARTMENT ADDRESS WHICH IS THE SUBJECT OF THIS MOTION: **7 Stillo Drive, Airmont, New York  10952**

2. LENDER NAME **KeyBank National Association**

3. DATE OF MORTGAGE:  **November 27, 2007**

4. POST-PETITION PAYMENTS ADDRESS:  **Post Office Box 94968, Cleveland, Ohio 44101**

### DEBT/VALUE REPRESENTATIONS

5. TOTAL PRE-PETITION AND POST-PETITION INDEBTEDNESS OF DEBTORS TO MOVANT AT THE TIME OF FILING THE MOTION:  **$415,384.29 as of April 22, 2021**

(Note: this amount may not to be relied on as a "payoff" quotation.)

6. MOVANT'S ESTIMATED MARKET VALUE OF THE REAL PROPERTY OR COOPERATIVE APARTMENT: **$798,000.00**

7. SOURCE OF ESTIMATED VALUATION: **Debtor's Schedule D filed October 21, 2019**

## STATUS OF DEBT AS OF
## THE PETITION DATE

8. TOTAL PRE-PETITION INDEBTEDNESS OF DEBTOR(S) TO MOVANT AS OF PETITION FILING DATE:
    a. AMOUNT OF PRINCIPAL: **$373,130.00**
    b. AMOUNT OF INTEREST: **$24,998.01**
    c. AMOUNT OF ESCROW (taxes and insurance): **$0.00**
    d. AMOUNT OF FORCED PLACED INSURANCE EXPENDED BY MOVANT: **$0.00**
    e. AMOUNT OF ATTORNEYS' FEES BILLED TO DEBTOR(S) PRE-PETITION: **$\*\***
    f. AMOUNT OF PRE-PETITION LATE FEES, IF ANY, BILLED TO DEBTOR(S): **$\*\***

9. CONTRACTUAL INTEREST RATE:**4.240 %**  (If interest rate is (or was) adjustable, please list the rate(s) and date(s) the rate(s) was/were in effect on a separate sheet and attach the sheet as an exhibit to this form; please list the exhibit number here: .)

10. PLEASE EXPLAIN ANY ADDITIONAL PRE-PETITION FEES, CHARGES OR AMOUNTS CHARGED TO DEBTOR'S/DEBTORS' ACCOUNT AND NOT LISTED ABOVE:

    **\*\* Fees as per POC filed 10/31/2019         $615.00**

    (If additional space is needed, please list the amounts on a separate sheet and attach the sheet as
    an exhibit to this *form;* please list the exhibit number here: _____

## AMOUNT OF ALLEGED POST-PETITION DEFAULT

## (AS OF 4/22/2021)

11. DATE LAST PAYMENT WAS RECEIVED: **May 7, 2018**

12. ALLEGED TOTAL NUMBER OF PAYMENTS DUE POST-PETITION FROM
FILING or PETITION THROUGH PAYMENT DUE ON  April 15, 2021 – 19 payment

13. PLEASE LIST ALL POST-PETITION PAYMENTS ALLEGED TO BE IN DEFAULT:

| Alleged Payment Due Date | Alleged Amount Due | Amount Received | Amount Applied to Principal | Amount Applied to Interest | Amount Applied to Escrow | Late Fee Charged (if any) |
|---|---|---|---|---|---|---|
| 10/15/2019 | $1,371.89 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 11/15/2019 | $1,343.67 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 12/15/2019 | $1,246.67 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1/15/2020 | $1,264.45 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2/15/2020 | $1,262.11 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3/15/2020 | $1,178.64 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 4/15/2020 | $1,108.07 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 5/15/2020 | $761.56 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 6/15/2020 | $786.93 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 7/15/2020 | $761.55 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 8/15/2020 | $3,689.54 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 9/15/2020 | $888.48 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 10/15/2020 | $685.39 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 11/15/2020 | $761.56 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 12/15/2020 | $761.55 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1/15/2021 | $786.94 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2/15/2021 | $788.40 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3/15/2021 | $738.18 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

| 4/15/2021 | $712.73 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
|-----------|---------|-------|-------|-------|-------|-------|

The loan is contractually due for the February 15, 2018 payment.

14. AMOUNT OF MOVANT'S ATTORNEYS FEES BILLED TO DEBTOR FOR THE PREPARATION, FILING AND PROSECUTION OF THIS MOTION: **$1,050.00**

15. AMOUNT OF MOVANT'S FILING FEE FOR THIS MOTION: **$188.00**

16. OTHER ATTORNEYS' FEES BILLED TO DEBTOR POST-PETITION: **$0.00**

17. AMOUNT OF MOVANT'S POST-PETITION INSPECTION FEES: **$0.00**

18. AMOUNT OF MOVANT'S POST-PETITION APPRAISAL/BROKER'S PRICE OPINION: **$0.00**

19. AMOUNT OF FORCED PLACED INSURANCE OR INSURANCE PROVIDED BY THE MOVANT POST-PETITION: **$0.00**

20. SUM HELD IN SUSPENSE BY MOVANT IN CONNECTION WITH THIS CONTRACT, IF APPLICABLE: **$0.00**

21. AMOUNT OF OTHER POST-PETITION ADVANCES OR CHARGES, FOR EXAMPLE TAXES, INSURANCE INCURRED BY DEBTOR ETC.: $

## REQUIRED ATTACHMENTS TO MOTION

Please attach the following documents to this motion and indicate the exhibit number associated with the documents.

(1) Copies of documents that indicate Movant's interest in the subject property. For purposes of example only, a complete and legible copy of the promissory note or other debt instrument together with a complete and legible copy of the mortgage and any assignments in the chain from the original mortgagee to the current moving party. (Exhibit A and/or B)

(2) Copies of documents establishing proof of standing to bring this Motion. (Exhibit A and/or B)

(3) Copies of documents establishing that Movant's interest in the real property or cooperative apartment was perfected. For the purposes of example only, a complete and

legible copy of the Financing Statement (UCC-i) filed with either the Clerk's Office or the Register of the county the property or cooperative apartment is located in. (Exhibit A and/or B)

## CERTIFICATION FOR BUSINESS RECORDS

I _Rhianna Ford_ , CERTIFY THAT THE INFORMATION PROVIDED IN THIS WORKSHEET AND/OR ANY EXHIBITS ATTACHED TO THIS WORKSHEET (OTHER THAN THE TRANSACTIONAL DOCUMENTS ATTACHED AS REQUIRED BY PARAGRAPHS 1, 2 AND 3, IMMEDIATELY ABOVE) IS DERIVED FROM RECORDS THAT WERE MADE AT OR NEAR THE TIME OF THE OCCURRENCE OF THE MATTERS SET FORTH BY, OR FROM INFORMATION TRANSMIT]'ED BY, A PERSON WITH KNOWLEDGE OF THOSE MATTERS, WERE KEPT IN THE COURSE OF THE REGULARLY CONDUCTED ACTIVITY; AND WERE MADE BY THE REGULARLY CONDUCTED ACTIVITY AS A REGULAR PRACTICE.

I FURTHER CERTIFY THAT COPIES OF ANY TRANSACTIONAL DOCUMENTS ATTACHED TO

THIS FORM AS REQUIRED BY PARAGRAPHS 1, 2 AND 3, IMMEDIATELY ABOVE, ARE TRUE AND ACCURATE COPIES OF THE ORIGINAL DOCUMENTS. I FURTHER CERTIFY THAT THE ORIGINAL DOCUMENTS ARE IN MOVANT'S POSSESSION, EXCEPT AS FOLLOWS:

_____.

## DECLARATION

I, _Rhianna Ford_, A _Sr. Specialist_ WITH KEYBANK NATIONAL ASSOCIATION, HEREBY DECLARE (OR CERTIFY, VERIFY, OR STATE) PURSUANT 28 U.S.C. SECTION 1746 UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT BASED ON PERSONAL KNOWLEDGE OF THE MOVANT'S BOOKS AND BUSINESS RECORDS.

EXECUTED AT _Brooklyn_ , _Ohio_
ON THIS _12_ DAY OF _May_ , 2021.

Name: _Rhianna Ford_
Title: _Sr. Specialist_
Address: _4910 Tiedeman Rd Brooklyn, Oh 44189_